

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-31-1996

# McNemar v. The Disney Store Inc

Precedential or Non-Precedential:

Docket 95-1590

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"McNemar v. The Disney Store Inc" (1996). *1996 Decisions.* Paper 135.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/135

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

                 UNITED STATES COURT OF APPEALS
                     FOR THE THIRD CIRCUIT



                          No. 95-1590



          LEONARD C. MCNEMAR,

                                   Appellant

               v.

          THE DISNEY STORE, INC.,

                                   Appellee.




          Appeal from the United States District Court
           for the Eastern District of Pennsylvania
                   (D.C. No. 94-cv-06997)



           Argued: Tuesday, June 11, 1996

          Before: STAPLETON, GREENBERG and ALDISERT,
                     Circuit Judges.

                  (Filed July 31, 1996)


                         Alan B. Epstein (argued)
                         JABLON EPSTEIN WOLF & DRUCKER
                         The Bellevue
                         Broad Street at Walnut
                         Ninth Floor
                         Philadelphia, PA  19102-3803

                            ATTORNEY FOR APPELLANT
                            LEONARD C. MCNEMAR

                         Anthony B. Haller (argued)
                         Jill G. Weitz

PEPPER, HAMILTON & SCHEETZ
3000 Two Logan Square
18th & Arch Streets
Philadelphia, PA  19103-2799

      ATTORNEY FOR APPELLEE
      THE DISNEY STORE, INC.

Vicki Laden
LEGAL AID SOCIETY OF SAN
   FRANCISCO
Employment Law Center
1663 Mission Street
Suite 400
San Francisco, CA  94103

      ATTORNEY FOR AMICUS
      CURIAE, THE
      EMPLOYMENT LAW CENTER,
      THE LAMBDA LEGAL DEFENSE
      AND EDUCATION FUND, THE
      AIDS LAW PROJECT OF
      PENNSYLVANIA, AND THE
      DISABILITY RIGHTS

      EDUCATION AND DEFENSE
      FUND, INC.

Stephen M. Koslow
AMERICAN ASSOCIATION OF RETIRED
  PERSONS
601 E. Street, N.W.
Washington, D.C.  20049

      ATTORNEY FOR AMICUS
      CURIAE, THE AMERICAN
      ASSOCIATION OF RETIRED

      PERSONS

Richard M. Schall
TOMAR, SIMONOFF, ADOURIAN,
O'BRIEN, KAPLAN, JACOBY &
GRAZIANO
41 South Haddon Avenue
Haddonfield, New Jersey  08033

      ATTORNEY FOR AMICUS
      CURIAE, NEW JERSEY
      EMPLOYMENT LAWYERS'
      ASSOCIATION

Robert J. Gregory (argued)
Room 7032

EQUAL EMPLOYMENT OPPORTUNITY

COMMISSION

1801 L. Street N.W.
Washington, D.C. 20507

ATTORNEY FOR AMICUS
CURIAE, EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION

Michael J. Ossip
MORGAN, LEWIS & BOCKIUS
2000 One Logan Square
Philadelphia, PA 19103

ATTORNEY FOR AMICUS
CURIAE, THE CHAMBER
OF
COMMERCE OF THE UNITED

STATES OF AMERICA

Ann E. Reesman
MCGUINESS & WILLIAMS
1015 Fifteenth St., N.W.
Suite 1200
Washington, D.C. 20005

ATTORNEYS FOR AMICUS

CURIAE, THE EQUAL

EMPLOYMENT ADVISORY
COUNCIL

_____

OPINION OF THE COURT
_____

ALDISERT, Circuit Judge.

Under the particular facts presented here we must decide whether the teachings of Ryan Operations G.P. v. Santium-Midwest Lumber Co., 81 F.3d 355 (3d Cir. 1996), may be applied in this case to invoke the doctrine of judicial estoppel. Specifically, we must decide whether Appellant is judicially estopped from contending that he is a "`qualified person with a disability' . . . who, with or without reasonable accommodation, can perform the essential functions" of a job as contemplated by the Americans With Disabilities Act, 42 U.S.C.    12111(8), 12112(a), in light of his representations to federal and state government agencies that he is totally disabled and unable to

work.

This issue is presented in Leonard McNemar's appeal from the district court's order granting The Disney Store's motion for summary judgment on McNemar's discrimination claims under the Americans With Disabilities Act (ADA), the New Jersey Law Against Discrimination (NJLAD), and  510 of the Employee Retirement Income Security Act (ERISA).  McNemar appeals also from the district court's order granting Disney summary judgment on his New Jersey state law claims for invasion of privacy and intentional infliction of emotional distress.

In granting summary judgment, the district court held that McNemar was judicially estopped from asserting his claims under the ADA, NJLAD, and ERISA because of his prior sworn statements, made in his application for Social Security Disability Insurance benefits and New Jersey state disability benefits, that he was unable to work because of a disabling physical condition.  The district court further held that McNemar had failed to satisfy prima facie requirements of his state law claims of invasion of privacy and intentional infliction of emotional distress.

The district court had jurisdiction over Appellant's ADA and ERISA claims pursuant to 28 U.S.C.  1331.  The district court had supplemental jurisdiction over Appellant's state law claims pursuant to 28 U.S.C.  1367.  This court has jurisdiction pursuant to 28 U.S.C.  1291.  The appeal was timely filed under Rule 4(a), Federal Rules of Appellate Procedure.

This court reviews the district court's application of judicial estoppel for abuse of discretion.  Yanez v. United States, 989 F.2d 323 (9th Cir. 1993); Levin v. Robinson, Wayne & La Sala, 586 A.2d 1348, 1357 (N.J. Super. Law Div. 1990) (citing Matter of Cassidy, 892 F.2d 637, 642 (7th Cir. 1990)).  This court has plenary review of the district court's order granting summary judgment on the state law claims.  Kinney v. Yerusalim, 9 F.3d 1067, 1070 (3d Cir. 1993), cert. denied, 114 S. Ct. 1545 (1994).

Because application of the doctrine of judicial estoppel always is factually driven, we now will set forth the facts in extensive narrative detail.

I.

McNemar was employed by The Disney Store, Inc. as an assistant store manager in Cherry Hill, New Jersey.  On October 12, 1993, McNemar was hospitalized for pneumocystis carinii pneumonia and diagnosed as HIV-positive.  Between becoming ill in October 1993 and being terminated at Disney on November 18, 1993, McNemar would miss 17 1/2 of 25 work days (68% of his normal working time).

McNemar revealed the results of his diagnosis to Lillian Forcey, the store manager, whom he considered to be his friend.  He did not tell anyone else at the store, but he did tell other friends, including two people he had worked with at a Disney store in Delaware before his transfer to Cherry Hill in 1992.

On November 8, 1993, Joelyn Ale, the Disney Store District Manager, summoned McNemar to her office, privately informed him that she had heard rumors that he had tested positive for HIV, and asked if the rumors were true. Ale explained that she was informing McNemar of the rumors so that, should he want to, he could address them. McNemar admits that Ale was being supportive, offering to help him in any way possible. However, he told Ale that he was not in fact HIV-positive, but that he had pneumonia. McNemar thanked Ale for informing him of the rumors, declined any assistance, and said he thought he knew the source and would deal with the problem himself.

On November 16, 1993, in knowing violation of company policy, McNemar took two dollars from the store cash register and asked another employee, Estelle Williamson, to use the money to purchase cigarettes for him. Because Disney policy requires that all employees store their personal belongings in lockers in the back of the store, McNemar had no cash on his person. Rather than go to his locker to retrieve money from his wallet, McNemar took the two dollars from the cash register and gave it to Williamson to purchase the cigarettes. McNemar then discarded the cash register transaction record, which, according to company policy, must be signed and filed whenever money from the cash register is used.

Williamson purchased the cigarettes and then called Disney's Loss Prevention Hotline to report that McNemar had taken money from the register, in violation of Disney's anti-shrinkage policy. After Williamson returned with the cigarettes, McNemar took a smoke break in the back of the store, but failed to retrieve his own money in order to reimburse the cash register.

McNemar had sole responsibility for closing the store that night, a procedure that included balancing cash deposits with receipts. In performing this task, McNemar still did not replace the cash in the register or put it with the cash deposits for the day; he simply sealed the cash deposit bags without replacing any money. Even though the daily balance was discrepant by the two dollars he had taken, McNemar made no notation or report of what had occurred.

Meanwhile, Williamson had reported McNemar's initial infraction to another assistant manager, Maria Skyrm Brookover. Brookover checked the register, found that it was two dollars short, and looked unsuccessfully for a transaction record in the accordion file where it should have been placed. Brookover instructed Williamson to call Disney's "Loss Prevention Hotline"; Brookover also called the hotline herself.

The next morning, November 17, 1996, Evelyn McCorristin, the assistant manager who opened the store, followed standard store procedures in checking the previous day's cash deposits, register amounts, and the safe fund. McCorristin discovered that the cash deposits were off by two dollars, and noted the discrepancy. She then counted the register and safe fund amounts, which were as they should have been, not containing any extra money. A short time later, Brookover, who was not working that morning, called McCorristin to ask whether there was

still a dollar shortage; McCorristin told her that there was. Brookover then told Ale about what had happened the previous day, confirming that the money was still missing.

The Disney Store management then began the investigation procedure it uniformly follows when an employee is reported for the unauthorized taking of company money or property for personal use. On November 18, 1996, McNemar's next day of work, he was interviewed by Ale, in person, and by Jeff Hill, a Disney Store Loss Prevention Supervisor in Atlanta, by telephone. During the interview, McNemar admitted to taking the money for his personal use, after which, at Hill's request, McNemar wrote and signed a statement recounting his actions in the matter.

On the basis of this admission, Ale and Hill then immediately suspended McNemar, asked him for his store keys and identification, and told him that they would speak to Disney headquarters in California about whether he should be discharged. At this point McNemar broke down in tears and apologized for taking the money, then divulged that he was HIV-positive.

Ale reported the substance of the interview to Teri Meiers, Employee Relations Supervisor at California Headquarters. Upon hearing that McNemar had at the last minute revealed that he was HIV-positive, Meiers thought it prudent to check with her superiors before approving a discharge. She consulted with Michael Frank, Vice President for Human Resources, who felt the situation was clear-cut and required a discharge, and with Curt Carlile, then Manager of Training and Employee Relations, who concurred. Both Frank and Carlile felt that McNemar should not be penalized less severely than other employees in similar situations simply because of his disclosure.

Later that same day, Ale telephoned McNemar and asked him to come in for another meeting to discuss the decision to terminate his employment. When McNemar refused to come in, Ale told him of the decision to discharge him.

II.

Following his dismissal, McNemar applied for and received New Jersey state disability benefits, Social Security disability benefits, and exemption from repayment of an educational loan from the Pennsylvania Higher Education Agency. To obtain these benefits, McNemar and his doctors have certified under penalty of perjury that he has been totally and permanently disabled and unable to work since October 1, 1993, at least five weeks before he was discharged by Disney.

For example, in his November 23, 1993, application for Social Security Disability Insurance (SSDI) benefits, McNemar made a sworn statement that he "became unable to work because of my disabling condition on October 01, 1993." On the same date, McNemar applied for Supplemental Social Security Income (SSI), and on that application he stated that he was disabled and was informed that making false statements would subject him to civil and criminal penalties.

On December 2, 1993, McNemar applied for New Jersey State disability benefits, certifying that his disability was "AIDS" and that he had been afflicted since October 12, 1993.

On January 11, 1994, McNemar certified to the New Jersey State Disability Insurance Service that he had been "unable to perform the duties of [his] regular occupation" since October 12, 1993.

On his December 2, 1993 application for state disability benefits, McNemar submitted a statement, signed by Dr. Roseann Lorenick, his physician at the time, that McNemar had been disabled and unable to work because of a disability from "10/93 to present."  JA 166.  On January 20, 1994, Dr. Lorenick certified that McNemar had been under her care for the "period of disability" from "10/14/93 through present"  and that "[t]he patient has been unable to perform all the duties of his/her regular or usual job (i.e., too disabled to work) from 10/16/93."  JA 169.  And on June 15, 1994, Dr. John Turner, a specialist whom McNemar began seeing in February 1994, certified that "[a]s of October 13, 1993 Mr. McNemar has been totally and permanently disabled."  JA 179.

On July 19, 1994, McNemar applied to the Pennsylvania Higher Education Agency for a deferment from making payments on his loan principal, on the basis that he was "unable to work and earn money."  JA 178.  On July 27, 1994, when completing his portion of McNemar's loan deferment application, Dr. Turner faced a choice of certifying that McNemar had (1) a temporary disability or (2) a total and permanent disability.  Dr. Turner chose the latter, signing the following statement:

> I certify that in my best professional judgment [McNemar is] . . . [p]ermanently totally disabled and so is unable to work and earn money because of an impairment that is expected to continue indefinitely or result in death.

JA 178.

III.

On November 17, 1994, McNemar filed a complaint against Disney which alleged unlawful discrimination in violation of the ADA and ERISA and which, relying on supplemental jurisdiction, contained several state law claims.  On May 8, 1995, Disney moved for summary judgment on all of McNemar's claims.  On June 16, 1995, McNemar filed his brief in opposition and formally withdrew, with prejudice, half of his claims because they provided redundant bases of recovery.  On June 30, 1995, the district court granted Disney's motion and entered judgment in Disney's favor on all of McNemar's remaining claims, holding that McNemar was judicially estopped from asserting his claims under the ADA, NJLAD and ERISA because of his prior sworn statements to various government agencies that he was totally and permanently disabled and unable to work.  The district court held also that McNemar had failed as a matter of law to satisfy prima facierequirements of his state law claims for invasion of privacy and intentional infliction of emotional distress.  This appeal followed.

IV.

The doctrine of judicial estoppel serves a consistently

clear and undisputed jurisprudential purpose: to protect the integrity of the courts.  The Court of Appeals for the Ninth Circuit recently described this as the basis on which a court has the discretion to exercise judicial estoppel: "[T]he purpose of the doctrine is to protect the integrity of the judicial process. Accordingly, the doctrine of judicial estoppel `is an equitable doctrine invoked by a court at its discretion.'"  Yanez v. U.S., 989 F.2d 323, 326 (9th Cir. 1993) (quoting Morris v. California, 966 F.2d 448, 452-53 (9th Cir. 1991), cert. denied, 506 U.S. 831, (citation omitted) (1992)).

       This court has accepted the doctrine of judicial estoppel at least since Scarano v. Central Railroad Co. of New Jersey, 203 F.2d 510, 513 (3d Cir. 1953), and consistently has reiterated the judicial system integrity purpose of the doctrine. See, e.g., Ryan Operations G.P. v. Santium-Midwest Lumber Co., 81 F.3d 355, 361 (3d Cir. 1996) ("[j]udicial estoppel is intended to prevent parties from playing fast and loose with the courts by asserting inconsistent positions"); EF Operating Corp. v. American Buildings, 993 F.2d 1046, 1050 (3d Cir.), cert. denied, 114 S. Ct. 193 (1993) ("It goes without saying that one cannot casually cast aside representations, oral or written, in the course of litigation simply because it is convenient to do so"); Fleck v. KDI Sylvan Pools, Inc., 981 F.2d 107, 121 (3d Cir. 1992), cert. denied, 113 S. Ct. 1645 (1993) (judicial estoppel "preserves the integrity of the judicial system" by preventing parties from "assert[ing] a position in this proceeding inconsistent with the one they previously asserted"); Delgrosso v. Spang & Co., 903 F.2d 234, 241 (3d Cir.), cert. denied, 498 U.S. 967 (1990) (judicial estoppel "precludes a party from assuming a position in a legal proceeding that contradicts or is inconsistent with a previously asserted position"); United States v. Gleason, 458 F.2d 171, 175 (3d Cir. 1972) (judicial estoppel is "applied to secure substantial equity").

       McNemar argues that the use of judicial estoppel is subject to narrow requirements that preclude its use here:

> Thus, in this Circuit, a litigant seeking to judicially estop his opponent from asserting a contrary position must show that: (1) his opponent had asserted an inconsistent position under oath in a prior judicial proceeding; (2) the prior statement was accepted by a judicial tribunal; (3) he was a litigant to the first judicial proceeding; and (4) he would be prejudiced unless the opponent is estopped.

Appellant's Br. at 22 (relying on, inter alia, Scarano).  We disagree.  The Scarano court was careful to warn that in applying judicial estoppel, "`each case must be decided upon its own particular facts and circumstances.'"  Scarano, 203 F.2d at 513 (quoting Galt v. Phoenix Indemnity Co., 120 F.2d 723, 726 (App.D.C. 1941)).  Moreover, in Ryan Operations this court recently emphasized that the application of judicial estoppel is not limited in the formulaic manner urged by Appellant:

> There are many instances in which the assertion of inconsistent positions can work to the advantage of a

> party but where there is no identity or relationship
> between those against whom the claim (or defense) is
> asserted. Where the contentions are mutually
> exclusive, it is irrelevant that they are asserted
> against diverse parties for the purposes of determining
> judicial estoppel. The integrity of the court is
> affronted by the inconsistency notwithstanding the lack
> of identity of those against whom it is asserted.

Ryan Operations, 81 F.3d at 360. Thus the doctrine of this court on judicial estoppel remains rooted in the twin concepts that have characterized our jurisprudence from our early pronouncements in Scarano in 1953 to the current refinements expressed this year in Ryan Operations: judicial estoppel is an equitable doctrine, invoked by a court in its discretion (1) to preserve the integrity of the judicial system by preventing parties from playing fast and loose with the courts in assuming inconsistent positions, and (2) with a recognition that each case must be decided upon its own particular facts and circumstances.

In light of this clearly established rationale, the district court was well within its discretion to hold that McNemar "is estopped from arguing now that he is `qualified' under the ADA and NJLAD." Dist. Ct. Op. at 8-9. Indeed, the jurisprudence of this court on judicial estoppel would seem to speak directly to McNemar's situation: "[t]o permit a party to assume a position inconsistent with a position it had successfully relied upon in a past proceeding `would flagrantly exemplify . . . playing "fast and loose with the courts" which has been emphasized as an evil the courts should not tolerate.'" Delgrosso, 903 F.2d at 241 (quoting Scarano, 203 F.2d at 513).

We are satisfied that the district court's application of judicial estoppel qualifies under the two-part threshold inquiry articulated in Ryan Operations: (1) Is the party's present position inconsistent with a position formerly asserted? (2) If so, did the party assert either or both of the inconsistent positions in bad faith -- i.e., "with intent to play fast and loose" with the court? Ryan Operations, 81 F.3d at 361.

Clearly McNemar has asserted inconsistent positions regarding his ability to work. Before the Social Security Administration he and his physicians have certified under penalty of perjury that he was totally and permanently disabled. He made similar representations when he applied for New Jersey state disability benefits. And when applying for an exemption from making payments on his student loans, he represented to the state of Pennsylvania that he was unable to work and earn money. Thus, McNemar has represented to one federal agency and to the agencies of two different states that he was totally disabled and unable to work -- while now, in claiming relief under the American Disabilities Act, he states that he is "a qualified person with a disability who, with or without reasonable accommodation, can perform the essential functions of a job" as contemplated by 42 U.S.C. 12111(8), 12112(a).

Moreover, well reasoned decisions have judicially

estopped plaintiffs in situations similar to this one from "speak[ing] out of both sides of [their] mouth with equal vigor and credibility before [the] court." Riegel v. Kaiser Foundation Health Plan of N.C., 859 F. Supp. 963, 970 (E.D.N.C. 1994). See, e.g., August v. Offices Unlimited, Inc., 981 F.2d 576, 582-84 (1st Cir. 1992); Garcia-Paz v. Swift Textiles, 873 F. Supp. 547, 554 (D. Kan. 1995); Kennedy v. Applause, Inc., 1994 WL 740765 at *3-*4 (C.D. Cal. Dec. 6, 1994). McNemar's statements on his disability benefits application are "unconditional assertions as to his disability"; he should not now be permitted to "qualify those statements where the application itself is unequivocal." Smith v. Midland Brake, Inc. 911 F. Supp. 1351, 1361 (D.Kan. 1995) (citing Scarano, 203 F.2d at 513).

## V.

McNemar alleges that in terminating his employment, Disney violated the Americans With Disabilities Act and the New Jersey Law Against Discrimination. Because the New Jersey statute relies on the same analytical framework as does the federal act, the district court addressed these claims together. Dist. Ct. Op. at 6-7 (citing Shaner v. Horizon Bancorp., 561 A.2d 1130, 1132 (N.J. 1989)). To qualify for protection against discrimination under Title I of the ADA, a plaintiff must prove that he or she is a "qualified person with a disability who, with or without reasonable accommodation, can perform the essential functions of the job." 42 U.S.C.  12111(8), 12112(a). Accordingly, a person unable to work is not intended to be, and is not, covered by the ADA. See 42 U.S.C.  423(d); see also H.R. Rep. No. 101-485 (II), 101st Cong. 2d. Sess. 71 (1990), reprinted in 1990 U.S.C.C.A.N. 353; H.R. Rep. No. 101-485 (III), 101st Cong. 2d. Sess. 35-36 (1990), reprinted in 1990 U.S.C.C.A.N. 458. The New Jersey statute contains a similar requirement, prohibiting discrimination against handicapped persons "unless the nature and extent of the handicap reasonably precludes the performance of the particular employment." N.J.S.A.  10:5-4.1. Thus to be covered by these statutes, McNemar had to prove that at all material times he was able to perform the essential functions of his job, with or without accommodation. See McDonald v. Commonwealth of Pennsylvania, 62 F.3d 92, 96 (3d Cir. 1995).

In arriving at its decision, the district court observed that "most federal courts agree that an employee who represents on a benefits application that he is disabled is judicially estopped from arguing that he is qualified to perform the duties of the position involved." Dist. Ct. Op. at 9; see, e.g., August v. Offices Unlimited, Inc., 981 F.2d 576, 582-84 (1st Cir. 1992) (plaintiff who certified on form for disability benefits that he was "totally disabled" was precluded as a matter of law from arguing that he was a "qualified handicapped person" under Massachusetts law); Garcia-Paz v. Swift Textiles, 873 F. Supp. 547, 554 (D. Kan. 1995) (plaintiff with multiple sclerosis who certified on long-term disability benefits application that she was "unable to perform material duties of work" was estopped from arguing that she was qualified individual under ADA);

Kennedy v. Applause, Inc., 1994 WL 740765 at *3-*4 (C.D. Cal. Dec. 6, 1994) (plaintiff with chronic fatigue syndrome who represented for purposes of obtaining disability benefits that she was completely disabled was estopped from arguing that she was qualified under ADA); Riegel, 859 F. Supp. at 967-70 (plaintiff with shoulder injury who claimed for purposes of receiving disability insurance payments that she was prematurely disabled was estopped from arguing that she was qualified under ADA).

Thus even though this court has not previously applied judicial estoppel to facts similar to those before us here, other federal courts have addressed analogous factual situations, and many have judicially estopped the plaintiffs in those situations from "speak[ing] out of both sides of [their] mouth with equal vigor and credibility before [the] court." Riegel, 859 F. Supp. at 970. That precedential basis, and this court's teachings on judicial estoppel, clearly support the discretion of the district court to estop a party from asserting contradictory positions.

In adjudicating cases brought under the ADA and NJLAD, courts apply the burden-shifting framework applicable to cases brought under Title VII of the Civil Rights Act of 1964. See 42 U.S.C. 12117; Zambelli v. Historic Landmarks, Inc., 1995 WL 116669 at *3 (E.D. Pa. Mar. 20, 1995); Shaner, 561 A.2d at 1132. This framework has three steps: (1) the plaintiff bears the burden of establishing a prima facie case of discrimination; (2) the burden then shifts to the defendant, who must offer a legitimate non-discriminatory reason for the action; and (3) if the defendant satisfies this burden, the plaintiff must then come forth with evidence indicating that the defendant's proffered reason is merely a pretext. See Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

The district court determined that McNemar failed to establish a prima facie case of discrimination under the criteria articulated above because he admitted that he was not qualified to perform his job as Assistant Manager at Disney, and that he is thus judicially estopped from arguing that he is now "qualified" under the ADA and the NJLAD. Dist. Ct. Op. at 8-9. Under the facts of this case, we will not disturb that determination.

VI.

McNemar and the amici challenge the district court's application of the doctrine of judicial estoppel here, arguing at great length that the court unjustifiably has stretched the doctrine to address a problem that properly should be decided by looking to the legislative purposes of anti-discrimination that underlie the ADA. This is essentially the position of the court in Smith v. Dovenmuehle Morg., Inc., 859 F. Supp. 1138, 1141-43 (N.D. Ill. 1994), a case which the district court below studied and rejected. In Smith, a plaintiff with AIDS received disability benefits from the Social Security Administration on the representation that he was disabled, then sued his former employer under the ADA. In holding that the plaintiff was not judicially estopped from arguing that he was qualified under the

ADA, the court reasoned that to hold otherwise would put the plaintiff "in the untenable position of choosing between his right to seek disability benefits and his right to seek redress for an alleged violation of the ADA." Id. at 1142. The Smith court reasoned also that judicial estoppel would frustrate the ADA's purpose of combatting discrimination against disabled persons. Id.

In explaining its disagreement with the Smith court, the district court below addressed much of the challenge presented by the amici on the judicial estoppel issue. First, after recognizing the apparent unfairness of forcing individuals to choose between seeking disability benefits and suing under the ADA, the district court concluded that, nevertheless, "there is no indication that either the United States Congress or the New Jersey legislature intended to provide disability benefits to persons capable of obtaining gainful employment, and it is the province of the legislature rather than this Court to authorize such a double recovery." Dist. Ct. Op. at 11. Second, the district court reasoned that because a disabled person who believes he or she has been the victim of discrimination "retains the option of filing suit pursuant to the ADA, this Court fails to understand how the ADA's goals would be thwarted by adopting the principle of judicial estoppel in this case." Id. at 11-12.

The Employment Law Center, one of the amici curiae, argues that because "[t]he Social Security disability system and the [ADA]'s determination of disability diverge significantly in their respective legal standards and statutory intent," application of judicial estoppel "between them is thus inappropriate." Amicus Br. of Employment Law Center, et. al., at 4. Similarly, McNemar argues that, because AIDS is listed as a "presumptive disability" on the Social Security application forms, his representations that he is "totally and permanently disabled" do not render him unqualified to perform the job of Assistant Manager at Disney under the ADA and NJLAD. We disagree.

The fact that AIDS is listed as a "presumptive disability" on the benefit application forms is irrelevant to the case at hand, because the "presumptive disability" status serves only to eliminate the requirement that individuals afflicted with AIDS offer evidence that they are unable to perform their previous jobs. Whatever the Social Security Administration's criteria for eligibility for disability benefits, the fact remains that McNemar told the U.S. Government and the states of New Jersey and Pennsylvania under penalty of perjury that he was physically unable to work, and the district court had the discretion to judicially estop him from taking a contradictory position in this proceeding.

Moreover, we are troubled by this argument from Appellant and two amici, the Employment Law Center and the EEOC, for it carries the implication that a person afflicted with HIV somehow should be permitted to misrepresent important information. The fact that the choice between obtaining federal or state disability benefits and suing under the ADA is difficult does not entitle one to make false representations with impunity.

Nothing in the reasoned jurisprudence of judicial estoppel goes this far.  Nothing grants a person the authority to flout the exalted status that the law accords statements made under oath or penalty of perjury.  Nothing permits one to undermine the integrity of the judicial system "by playing fast and loose with the courts by asserting inconsistent positions."  Ryan Operations, 81 F.3d at 358.  Nothing vests such immunity.

                              VII.
          The EEOC argues also that McNemar's sworn declaration of total disability is "after-acquired evidence" that has no bearing on the prima facie issue of McNemar's status as a qualified individual with a disability.  Yet the threshold question in this case, fully examined by the district court, is precisely whether McNemar is covered by the ADA for purposes of his prima facie case.
          Nevertheless, the EEOC wants to mix apples -- a plaintiff's prima facie case -- with oranges -- a defendant's non-discriminatory-reason.  It seeks to analogize this case to the teachings of McKennon v. Nashville Banner Pub. Co., ___ U.S. ___, 115 S. Ct. 879 (1995), which address the doctrine of "after-acquired evidence" and establish it as an affirmative defense that becomes meaningful once the plaintiff has established a prima facie case of discrimination.  At that point, the employer is required to articulate its non-discriminatory reason and then may assert its additional defenses, such as after-acquired evidence, which may limit damages.  See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 523-24 (1993).
          We emphasize again that the relevant question in this case is whether McNemar established a prima facie case of discrimination, and because he has not, Disney has no obligation even to articulate a legitimate business reason for its decision.  See Hicks, 509 U.S. at 507; Sempier v. Johnson & Higgins, 45 F.3d 724, 730-32 (3d Cir.), cert. denied, 115 S. Ct. 2611 (1995).  Seen in this light, the EEOC's assertion that "[a] plaintiff's claim cannot be defeated by an issue of qualifications that has nothing to do with the employer's motivation for the adverse action" becomes irrelevant, again because that assertion has to do with Disney's putative pretext for firing McNemar, which is not a proper concern for the court unless McNemar first has established a prima facie case that he was qualified for the job.  This he failed to do.

                              VIII.
          We turn now to Appellant's other contentions.

                              A.
          McNemar alleges that Disney violated  510 of ERISA, 29 U.S.C.  1140, because one of the determining factors in Disney's decision to discharge McNemar was to prevent the vesting of his pension rights with Disney eleven months later.  To establish a prima facie case under ERISA, McNemar was required to show: (1) that he belongs to the protected class; (2) that he was qualified for the position involved; and (3) that he was discharged or

denied employment under circumstances that provide some basis for believing that the prohibited intent (to interfere with the employee's attainment of pension eligibility) was present. See Turner v. Schering–Plough Corp., 901 F.2d 335, 347 (3d Cir. 1990) (citing Dister v. Continental Group, Inc., 859 F.2d 1108, 1115 (2d Cir. 1988)).

For the reasons presented above, McNemar cannot establish the second required element for making a prima faciecase under ERISA –– that he is qualified for the position involved. Because McNemar has not, as a matter of law, established a prima facie case of a  510 violation, the district court properly entered judgment in favor of Disney on its motion for summary judgment regarding McNemar's ERISA claim.

## B.

New Jersey has recognized that the tort of invasion of privacy is "not one tort, but . . . comprises four distinct kinds of invasion of four different interests of the plaintiff, which are tied together by the common name . . . ." Rumbauskas v. Cantor, 649 A.2d 853, 856 (N.J. 1994) (quoting Canessa v. J.I. Kislak, Inc., 235 A.2d 62, [66] (N.J. Super. Law Div. 1967)). McNemar contends that Disney is liable for two of these: (1) intrusion upon his seclusion, and (2) public disclosure of private information. We disagree.

### 1.

New Jersey has adopted  652B of the Restatement (Second) of Torts, which states:

> One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

Figured v. Paralegal Technical Services, Inc., 555 A.2d 663, 666 (N.J. Super. App. Div. 1989) (quoting 3 Restatement (Second) of Torts  652B (1977)). Although the intrusion need not be by physical intrusion, the examples set forth in the Restatement all contain elements of involuntariness. See Rumbauskas, 649 A.2d at 857.

McNemar argues that Disney is liable for intrusion upon his seclusion because Joelyn Ale asked him whether he was HIV–positive. However, Ale's inquiry does not appear to have imposed an aspect of involuntariness on McNemar; indeed, McNemar has admitted that Ale's intent in the conversation about his condition was to be supportive, not confrontational. JA 30. McNemar certainly was not compelled to, and in fact did not, tell Ale about his condition. In light of this evidence, Ale's inquiry hardly was coercive, let alone "highly offensive to a reasonable person," and thus was not an invasion of privacy under New Jersey law.

2.

On the second basis of invasion of privacy -- public disclosure of private information -- McNemar alleges that Disney invaded his privacy by publicly disclosing private facts when, in late November 1993, an assistant store manager told Julia Walsh, a friend of McNemar's, that he had resigned because he had AIDS. To state a claim for public disclosure of private facts, a plaintiff must demonstrate (1) that the defendant has given publicity to matters that actually were private, (2) that dissemination of such facts would be offensive to a reasonable person, and (3) that there is no legitimate interest of the public in being apprised of the facts publicized. Bisbee v. John C. Conover Agency, Inc., 452 A.2d 689, 691-92 (N.J. App. Div. 1982) (adopting 3 Restatement (Second) of Torts  652D).

> The Restatement defines "publicity" as follows:
> "Publicity" . . . means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge . . . . Thus it is not an invasion of the right to privacy . . . to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons.

Restatement (Second) of Torts  652D, Comment (a).  The evidence of McNemar's publicity consists primarily of allegations of (1) a disclosure by a store manager to McNemar's aunt and uncle that he "had resigned because it was too much" on his health, and (2) a disclosure by an unidentified store employee to a friend of McNemar's who already knew that he was HIV-positive. JA 284, 724-5.  Clearly, as a matter of law, these allegations are not sufficient to state a prima facie case of invasion of privacy for publicity given to private facts.  Accordingly, the district court properly granted Disney's motion for summary judgment on this element of McNemar's claim.

C.

New Jersey law requires that a plaintiff who claims intentional infliction of emotional distress meet four requirements: (1) that the defendant acted recklessly or intentionally; (2) that the conduct was extreme and outrageous; (3) that the defendant's actions were the proximate cause of the plaintiff's distress; and (4) that the plaintiff actually suffered severe emotional distress. Figured, 555 A.2d at 665 (quoting Buckley v. Trenton Savings Fund Soc., 544 A.2d 857, [863] (N.J. 1988) and Restatement (Second) of Torts  46 (1965)).

McNemar's contention is unpersuasive because Disney's conduct was not extreme and outrageous, which under New Jersey law means conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." Figured, 555 A.2d at 665.  The record does not offer any evidence to suggest that Disney's discharge of McNemar was

extreme and outrageous.  McNemar admits that his discharge was handled in a discreet manner, and that the reasons for his discharge were not disclosed to others.  JA 39-40.  Moreover, there is no evidence that Disney harassed McNemar in any way; and termination of employment does not, without evidence of harassment, support a claim of intentional infliction of emotional distress.  See Heckroth v. Amer. Tel. & Tel., 1991 WL 157302 at *5 (E.D. Pa. Aug. 9, 1991) (citing Borecki v. Eastern Int'l Mat. Corp., 694 F. Supp. 47, 61 (D.N.J. 1988)).  McNemar has not alleged harassment by Disney.  Accordingly, the district court properly granted summary judgment in favor of Disney on McNemar's intentional infliction of emotional distress claim.

* * * * * * * * * *

We have considered all arguments presented by the parties and conclude that no further discussion is necessary.

The judgment of the district court will be affirmed.