James R. **DAYOUB,** Plaintiff,

v.

**PENN–DEL DIRECTORY COMPANY,** Defendant.

No. Civ.A. 97–3745.

United States District Court, E.D. Pennsylvania.

May 11, 1999.

James E. Campion, Jr., Philadelphia, PA, for plaintiff.

Imogene E. Hughes, Philadelphia, PA, for defendant.

## MEMORANDUM

REED, District Judge.

Plaintiff James R. Dayoub ("Dayoub") brought this lawsuit alleging that he is disabled and that his employer failed to accommodate his disability in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA"). Presently before the Court is the motion of the defendant Penn–Del Directory Company ("Penn–Del") for summary judgment (Document No. 12), the response of Dayoub thereto as well as the reply and sur-reply of the parties. Jurisdiction is proper pursuant to 28 U.S.C. § 1331. Based upon the following analysis the motion will be denied.

### I. Procedural History

Dayoub initially brought an administrative claim of disability discrimination with the Equal Employment Opportunity Commission ("EEOC"). Following its investigation, on March 4, 1997, the EEOC provided Dayoub with a right to sue letter. Dayoub then brought suit against Penn–Del and its parent corporation, Bell Atlantic Corporation. Bell Atlantic Corporation was dismissed from this action by agreement of the parties.

### II. Background[1]

Penn–Del is in the business of selling and servicing yellow pages advertising space in telephone books. Penn–Del hired Dayoub as part of its fast track management program on August 31, 1992. Dayoub was eligible for the fast track program because he had prior sales experience, including yellow pages advertising sales experience. As part of the program, Dayoub was placed in various sales and training positions for a limited time to give him a broad base of experience. Dayoub began the program in an account executive sales training class. Although Dayoub had per-formance issues relating to inappropriate behavior, Penn–Del kept him in the program. From March 8, 1993 through June 21, 1993, Dayoub worked as a sales coach. He was next assigned to be a personnel and training manager, a position he held until September 1993. Although Penn–Del asserts that Dayoub's supervisors were concerned that Dayoub had poor interviewing skills, had communication problems and had no concept of reporting times, Dayoub progressed to the position of District Sales Manager in September of 1993. As District Sales Manager, Dayoub experienced difficulties with paperwork requirements and management duties.

In March of 1994, Dayoub began seeing Olga L. Infante, M.D., a licensed psychiatrist. On April 6, 1994, after consultation with Dr. Infante, Dayoub informed Penn–Del that he was leaving work on short-term disability. As required by Penn–Del, Dayoub gave Penn–Del a note from Dr. Infante stating that Dayoub was suffering from depression and would be out for 8–10 weeks. (Plaintiff's Appendix in Support of His Response in Opposition to Defendant's Motion for Summary Judgment ("Plt.App.") at 1). On April 12, 1994, Penn–Del received a second note from Dr. Infante stating that Dayoub would be out for 6–8 weeks. (*Id.* at 2). On May 13, 1994, Dr. Infante wrote Penn–Del another note stating that Dayoub would be able to return to work in 4–6 weeks. (*Id.* at 3). Dr. Infante diagnosed Dayoub with Attention Deficit Disorder and depression.

During June, Dayoub and Dr. Infante began discussing Dayoub's return to work. In mid-June, Dayoub informed Penn–Del that his doctor told him he could return to work, but in a different position. (Defendant's Appendix in Support of Its Motion For Summary Judgment, ("Def.App.") at 53). However, Dayoub was told that the company usually requires that employees "be able to perform [their] normal job

---

1. The following facts are based on the evidence of record viewed in the light most favorable to Dayoub, the nonmoving party, as required when considering a motion for summary judgment. *See Carnegie Mellon Univ. v. Schwartz*, 105 F.3d 863, 865 (3d Cir.1997).

duties at 100% in order ... to return from disability." (*Id.*). On June 14, 1994, Dr. Infante wrote a note stating that Dayoub was presently unable to return to work and may need up to 3–4 weeks of leave. (Plt.App. at 4).

Dayoub, nevertheless, contacted Raymond Veth, Director of Corporate Personnel, and discussed returning with a reassignment to another position. Veth in turn discussed the possibility of assigning Dayoub a sales territory with Robert Brentari, Dayoub's supervisor. Veth told Dayoub that before any specific job decisions were made, he would have to speak with Dr. Infante. In late June or early July, Veth spoke with Dr. Infante. Dr. Infante expressed her concern that not working was contributing to Dayoub's depression and that she thought he should and could return to work, albeit in another position. She also described what she thought his strengths and limitations were.

Following their conversation,. Dr. Infante supplied Penn–Del with a psychiatric update dated July 5, 1994. (Plt.App. at 5). In the update, Dr. Infante states that it would be "safe and therapeutic" for Dayoub to return to work with some limitations. (*Id.*). Specifically, Dr. Infante stated that Dayoub would have difficulty with "multi-purpose roles where he is responsible for handling changes and supervising others." (*Id.*). Dr. Infante further suggested that Dayoub was "best suited to perform duties that he once mastered [and that] had a repetitive theme to them." (*Id.*). Dr. Infante also stated that Dayoub was aware that he would not be successful in a supervisory position and recommended that he be put in an instructing or training position.

Subsequently, Dayoub attempted to discuss his return to work with Veth. At that time, he was referred to John Boylan, Manager of Benefits. Boylan advised Dayoub that there was no opportunity for reassignment and that he could only come back to Penn–Del in his prior position of District Sales Manager. According to Dayoub, Boylan said the decision was final and that Dayoub needed clearance from his doctor before he could return to his old position of District Sales Manager. An internal phone call record reveals that prior to receiving the note from Dr. Infante clearing Dayoub to return to work, albeit in a different position, Boylan told the office with which Dayoub was communicating that "there is no position available for Jim. He must return to his DSM job at full capacity." (Def.App. at 57).

On August 5, 1994, Dr. Infante wrote a note stating that despite improvement in some areas, Dayoub was still experiencing significant impairment in other areas such as memory functioning. (Plt.App. at 6). Dr. Infante stated that Dayoub is still unable to perform his pervious job and would not be able to return to work for at least 4–6 weeks. On September 19, 1994 Dr. Infante wrote a final note stating that Dayoub would be able to return to work on October 17, 1994 but that "at this time he cannot return to his Sales and Sales Management position." (*Id.* at 7).

On September 23, 1994, Brentari called Dayoub to discuss the latest note from Dr. Infante. Accordingly to Dayoub, Brentari inquired whether Dayoub would be returning to his former position of District Sales Manager. Dayoub told him that he was uncertain and could not guaranty the October 17th return date. Brentari then explained that Dayoub had become eligible for long term disability on September 5, 1994, and that he could not hold Dayoub's position as District Sales Manager open indefinitely. Brentari then informed Dayoub that he was terminated. According to Penn–Del once an employee remains out from work for six months and becomes eligible for long term disability they are terminated from employment.

### III. Legal Standard Summary Judgment

Defendant has moved pursuant to Federal Rule of Civil Procedure 56 for summary judgment. Under Federal Rule of

Civil Procedure 56(c), summary judgment may be granted when, "after considering the record evidence in the light most favorable to the nonmoving party, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Turner v. Schering–Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). For a dispute to be "genuine," the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the moving party establishes the absence of a genuine issue of material fact, the burden shifts to the non-moving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The non-moving party may not rely merely upon bare assertions, conclusory allegations, or suspicions. *Fireman's Ins. Co. of Newark v. DuFresne*, 676 F.2d 965, 969 (3d Cir.1982).

## IV. Discussion

Penn–Del argues that Dayoub should be judicially estopped from asserting that he is a qualified individual with a disability within the meaning of the ADA. Penn–Del further argues that Dayoub cannot establish that he is a qualified individual with a disability under the ADA. Dayoub argues that judicial estoppel is inappropriate. Dayoub further argues that Penn–Del failed to reasonably accommodate him as required by the ADA.

## A. Judicial Estoppel

■■ The doctrine of judicial estoppel is designed to protect the integrity of the courts by preventing parties from asserting inconsistent positions in different legal proceedings. *See Ryan Operations G.P. v. Santiam–Midwest Lumber Co.*, 81 F.3d 355, 361 (3d Cir.1996). Penn–Del contends that Dayoub should be judicially estopped from asserting that he is a qualified individual with a disability because he has asserted in applications for disability benefits that he is totally disabled. *McNemar v. Disney Store, Inc.*, 91 F.3d 610 (3d Cir.1996), *cert. denied*, 519 U.S. 1115, 117 S.Ct. 958, 136 L.Ed.2d 845 (1997). The ADA does not apply to individuals who are totally disabled and unable to work. *See Smith v. Lindenmeyr Paper Co.*, 1997 WL 312077, at *4 (E.D.Pa. June 4, 1997).

As a preliminary matter, I note that the Court of Appeals for the Third Circuit has cast doubt on the continuing validity of *McNemar. See Krouse v. American Sterilizer Co.*, 126 F.3d 494, 502–03, nn. 3 & 4 (3d Cir.1997).[2] Nevertheless, *McNemar* remains the law in this Circuit. *Id.* at 503. In *Krouse*, however, the Court of Appeals expressed its concern that district courts were misapplying *McNemar. Id.* at n. 5. The *Krouse* Court cautioned that courts must consider the unique facts of the *McNemar* case and "should carefully adhere to the two-part test of *Ryan Operations*, ... before concluding that previous representations as to disability or inability to work judicially estop the individual from asserting such status." *Id.* at n. 5.

■■ Under the two-part test of *Ryan Operations*, the Court finds that its is inappropriate to apply the doctrine of judicial estoppel in this case.[3] In order to

**2.** Judge Mansmann, writing for the panel, acknowledged that *"McNemar* has been the object of considerable criticism" and described the decision of the Court of Appeals for the District of Columbia, which rejected the *McNemar* argument as "thoughtful." *Krouse*, 126 F.3d at 502–03 and n. 3. Moreover, Judge Mansmann noted that "Judge Becker is persuaded by the authorities set forth ... that *McNemar* was wrongly decided, and believes that the court should reconsider it at its first opportunity." *Id.* at 503 n. 4.

**3.** The Court notes that this case can be differentiated factually from *McNemar*. Here, there is a dearth of information regarding Dayoub's social security disability application. It appears, however, that Dayoub did not apply for social security disability benefits until sometime in 1997. (Deposition of

determine whether to apply the doctrine of judicial estoppel, a court must engage in a two-step inquiry: (1) is the party's present position inconsistent with a position formerly asserted; and (2) if so, did the party assert either or both of the inconsistent positions in bad faith—i.e., with an intent to play fast and loose with the court. *Ryan Operations,* 81 F.3d at 361. Only if both prongs are satisfied is judicial estoppel an appropriate remedy. *Id.* Even assuming that Dayoub's position in his application for disability benefits can be considered inconsistent with the position has asserts in this litigation, there is no evidence that Dayoub acted in bad faith. Thus, Dayoub is not judicially estopped from asserting a claim of disability under the ADA.

## B. The Americans with Disabilities Act

The ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that individual holds or desires." *Id.* § 12111(8).

To establish a prima facie case under the ADA, a plaintiff must demonstrate that: (1) he or she is a disabled person within the meaning of the ADA; (2) he or she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he or she has suffered an otherwise adverse employment decision as a result of discrimination. *Gaul v. Lucent Technologies, Inc.,* 134 F.3d 576, 580 (3d. Cir.1998) (citing *Shiring v. Runyon,* 90 F.3d 827, 831 (3d Cir.1996)).

▮ Penn–Del does not dispute that Dayoub is disabled within the meaning of the ADA. Rather, Penn–Del argues that Dayoub cannot meet the second prong—that he is not a "qualified individual with a disability." A two part test is used to determine whether someone is "a qualified individual with a disability." *Gaul,* 134 F.3d at 580. First, a court must consider whether "the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc." *Id.* Second, the court must consider "whether or not the individual can perform the essential functions of the

Dr. Infante, at 11–16). This litigation arises from events occurring during the summer of 1994. In *McNemar,* the plaintiff and his doctors certified under penalty of perjury that he had been totally and permanently disabled and unable to work from a time that pre-dated his dismissal by 5 weeks. 91 F.3d at 615. The timing is also significant because during the period relevant to this lawsuit and prior to applying for disability benefits, Dayoub applied for and received unemployment benefits. (He informed Penn–Del that he was applying for unemployment compensation because, although he was able to work in a different capacity, he was precluded from returning until he could perform the "full duties" of his former position. (Def.App. at 67)). Under Pennsylvania statutory law, in order to apply and receive unemployment compensation benefits, a person must certify that he or she "is able to work and available for suitable work." 43 Pa.Cons.Stat.Ann. § 801(d)(1); *Kuna v. Commonwealth of Pa. Unemployment Compensation Bd. of Review,* 98 Pa.Cmwlth. 604, 512 A.2d 772, 776 (1986) (unemployment compensation does not cover physically or mentally ill persons during periods they are unemployable). Finally, in *McNemar,* the plaintiff made statements of total and permanent disability to one federal agency and the agencies of two different states whereas here Penn–Del is relying on descriptions of Dayoub's limitations made by Dr. Infante to Dayoub's private disability insurer. *Id.* at 618; *see also Smith v. Lindenmeyr Paper Co.,* 1997 WL 312077, at *3–4 (plaintiff and doctors made unequivocal statements of total and permanent disability and plaintiff was collecting disability benefits from state and federal programs).

position held or desired, with or without reasonable accommodation." *Id.* The determination of whether an individual is qualified is made at the time of the employment decision. *Id.*

Dayoub does not dispute that his limitations prevent him from performing all the duties of a District Sales Manager. Indeed, both he and his doctor have consistently maintained that Dayoub could not return to work in his former capacity. The accommodation that Dayoub and his doctor requested was a reassignment to another position. Dayoub argues that Penn–Del failed to make a good faith effort to reasonably accommodate him.

■ Discrimination under the ADA is not limited to adverse actions motivated by prejudice and fear of disabilities, but also includes failing to reasonably accommodate a disabled employee's limitations. The ADA specifies that an employer discriminates against a qualified individual when it does "not mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual unless the [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the [employer]." 42 U.S.C. § 12112(b)(5)(A); *Taylor v. Phoenixville Sch. Dist.,* 174 F.3d 142, 151–52 (3d Cir. 1999).

■ The EEOC Regulations provide that a "reasonable accommodation may include ... reassignment to a vacant position...." 29 C.F.R. § 1630.2(*o*)(2)(ii). When an employee seeks a reassignment as an accommodation, the employee must " 'demonstrate that there were vacant, funded positions whose essential duties he was capable of performing, with or without reasonable accommodation, and that these positions were at an equivalent level or position as [his former job].' " *Gaul,* 134 F.3d at 580 (quoting *Shiring,* 90 F.3d at 832). If the plaintiff makes a prima facie showing, " 'the defendant then bears the burden of proving, as an affirmative de-

fense, that the accommodations requested by the plaintiff are unreasonable, or would cause an undue hardship on the employer.' " *Id.* (quoting *Shiring,* 90 F.3d at 831).

■ Penn–Del argues that there were no other positions available and, even if there were, Dayoub could not perform the essential functions of other positions. After carefully reviewing the record, I find that there is sufficient evidence to create a genuine issue of dispute regarding the availability of other positions and whether Penn–Del made a good faith effort to accommodate Dayoub. Accordingly, summary judgment will be denied. *Taylor,* 174 F.3d at 163 (summary judgment is inappropriate if genuine dispute exists as to employer's good faith in interactive process).

*The Interactive Process*

The ADA's regulations state that: "To determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the [employee] in need of accommodation. This process should identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(*o*)(3). Similarly, the EEOC's interpretive guidelines provide that: "Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability." 29 C.F.R. Pt. § 1630, App. § 1630.9. Based on the regulation and the interpretive guidelines, the Court of Appeals for the Third Circuit has held that " 'both parties have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith.' " *Taylor,* at 157 (quoting *Mengine v. Runyon,*

114 F.3d 415, 419–20 (3d Cir.1997) (en banc)).

In *Taylor*, the Court of Appeals for the Third Circuit discussed at length the form notice must take and the responsibilities of the employer in the interactive process following notice. The Court of Appeals explained that "[o]nce an employer knows of the disability and the employee's desire for accommodations, it makes sense to place the burden on the employer to request additional information that the employer believes it needs." *Taylor*, at 159. The Court of Appeals further explained that there are good reasons for placing some of the burden on the employer to request the information it needs because, disabled employees, especially those with psychiatric disabilities, may legitimately be reluctant to volunteer every detail of their medical records and employees with mental illness may have difficulty effectively relaying medical information about their condition. *Id.*

The *Taylor* Court also noted that failure of the plaintiff to request a specific accommodation or requesting an accommodation that was not feasible is not fatal to an ADA claim. The Court of Appeals reasoned that the interactive process requires the employer to take some initiative. Otherwise, if the process were interpreted to allow employers to be passive and then in post-termination litigation try to knock down every specific accommodation, the process would be of little significance. *Id.* at 159.

Finally, the Court of Appeals explained that assuming that an accommodation would fail regardless of the employer's bad faith would effectively eliminate the requirement that employers must participate in the interactive process. The Court of Appeals further explained that "because employers have a duty to help the disabled employee devise accommodations, an employer who acts in bad faith in the interactive process will be liable if the jury can reasonably conclude that the employee would have been able to perform the job with accommodations. In making that determination, the jury is entitled to bear in mind that had the employer participated in good faith, there may have been other, unmentioned possible accommodations." *Taylor*, at 162. Thus, the Court of Appeals concluded that where there are genuine disputes about whether an employer acted in good faith, summary judgment will typically be precluded. *Id.* at 163.

■ The employer's obligations under the interactive process are triggered once the employer is given notice of the disability and the employee requests accommodation. *Taylor*, at 158–59. There is no dispute that Penn–Del knew of Dayoub's disability and that Dayoub requested an accommodation, namely to be temporarily reassigned to a different position. Penn–Del therefore had an obligation to act in good faith to search for an appropriate reasonable accommodation.

■ Insisting that an employee, who requests reassignment, return to work in his former position "at full capacity" is wholly inconsistent with an employer's obligations to act in good faith in the interactive process an seek a reasonable accommodation. Here, there is evidence in the record that other positions in either a sales or training/instruction capacity were available. (Deposition Testimony of Robert Brentari, at 226–231; Affidavit of James Dayoub, at ¶¶ 3, 4). Moreover, after speaking with Dayoub's employer, Dayoub's doctor wrote a note stating that Dayoub could return to work with some limitations and recommended a training or instruction position.[4] Penn–Del's argument that the note was vague and unhelpful and that the limitations articulated in

---

4. Inexplicably, Penn–Del asserts that Dayoub's doctor never cleared him to return to work. However, in her note of July 5, 1994, Dr. Infante states that Dayoub can return to work with some limitations and recommends a training/instruction position. (Plt.App. at 5).

the note formed the basis for its determination that Dayoub would be unable to perform the essential functions of any available position lacks merit. If Penn–Del thought that the note was vague or if Penn–Del had concerns about Dayoub's ability to perform as an instructor (or did not understand the limitations described in the note), then Penn–Del " 'easily could have called [the psychiatrist] for a clarification.' " *Taylor,* at 160 (quoting *Bultemeyer v. Fort Wayne Community Schs.,* 100 F.3d 1281, 1285 (7th Cir.1996)). "The interactive process, as the name implies, requires the employer to take some initiative." *Id.*

Penn–Del further argues that it did fully investigate the possibility of Dayoub returning to work in a different capacity. (Attached to Defendant Penn–Del Directory Company's Brief in Support of Its Motion for Summary Judgment). To that end, Penn–Del has submitted the certified statement of John Boylan in which he states that he spoke with Dr. Infante on numerous occasions regarding Dayoub. Specifically, Boylan states that Dr. Infante informed him that Dayoub could not return to his former job District Sales Manager nor to any other type of sales job, from administrative or supervisory positions to telephone sales. Boylan also states that Dr. Infante raised the issue of a training or coaching job, but that once Boylan described what was involved in a training or coaching position, Dr. Infante agreed that Dayoub could not perform such a job. Boylan further states that Dr. Infante explained that Dayoub had short term memory loss and an inability to handle stress. In sum, Boylan's overall impression from his discussions with Dr. Infante were that despite any accommodation Penn–Del could offer, Dayoub was simply incapable of performing the essential functions of any position at Penn–Del. Penn–Del thus argues that, according to

Dayoub's doctor and despite their best efforts, a reassignment was not feasible and, therefore, accommodation impossible.

Dayoub, however, has introduced the certified statement of Dr. Infante in which she states that she never spoke with Boylan. (Attached to Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment). Dr. Infante states that the only person she spoke to at Penn–Del was Veth. Moreover, she states that Boylan's statement regarding the content of their alleged conversations is inconsistent with her beliefs about Dayoub's capabilities at the time and inconsistent with her attempts to return Dayoub to a different position at Penn–Del. She states that when she spoke with Veth, she explained that she thought it was important that Dayoub return to work and she described what Dayoub's capabilities and limitations were. Finally, Dr. Infante states that she would have released Dayoub to return to work had Penn–Del offered him an opportunity to return in a sales capacity or other appropriate capacity.

Viewing the evidence in the light most favorable to Dayoub, I conclude that there is sufficient evidence to raise a genuine issue of material fact as to whether Penn–Del engaged in the interactive process in good faith and whether Dayoub could have been reasonably accommodated but for Penn–Del's lack of good faith. The Court recognizes that Dayoub must still carry his ultimate burden of proving that at the time of his termination that he was capable of performing the essential duties, with or without reasonable accommodation, of the position he desired. However, "[w]hen an employee has evidence that the employer did not act in good faith in the interactive process, ... we will not readily decide on summary judgment that accommodation was not possible and that the employer's bad faith could have no effect." [5] *Taylor,*

---

**5.** In *Gaul,* the Court of Appeals held that the alleged failure of the employer to investigate into a reasonable accommodation was unimportant because the employee's proposed ac-

commodation was unreasonable as a matter of law. 134 F.3d at 581. In *Gaul,* the employee could not work if exposed to "prolonged and inordinate stress" and requested

at 163. Although the Court is not sanguine that Dayoub can carry his ultimate burden at trial, the Court cannot find as a matter of law that accommodation was impossible.

## V. Conclusion

This Court recognizes the sincerity of the arguments of the defendant and its position that Dr. Infante is somehow guilty of perfidious conduct in supporting her patient's ADA claim. However, the *Taylor* decision is binding authority on the burden of the employer to engage in the interactive process and this Court cannot ignore the factual disputes surrounding Penn–Del's efforts to accommodate Dayoub and the likely outcome of that process. This Court has no legal authority to decide these factual disputes. Resolution of such factual issues is reserved for the jury. Thus, based upon the foregoing analysis, the motion will be denied. An appropriate Order follows.

to be transferred away from individuals who caused him such stress. The Court of Appeals reasoned that such an amorphus standard would impose a wholly impracticable obligation on the employer. The Court of Appeals further reasoned that the employee's proposed accommodation would impose extraordinary administrative burdens on the employer. Thus, the Court of Appeals held that the proposed accommodation was unreasonable as a matter of law.

Here, in contrast, the requested accommodation is not unreasonable. Dayoub's request that he be temporarily reassigned until he is able to resume the duties of his former position is well within the range reasonable accommodations which an employer must consider. 29 C.F.R. § 1630.2(*o*)(2)(ii) (reasonable accommodation may include reassignment to a vacant position). In addition, there is evidence that such positions were available and that Dayoub's doctor cleared him to return to work. Finally, the limitations on Dayoub were task related and not dependant on an amorphus standard such as stress and Dayoub's reaction to co-workers. Therefore, the alleged failure of Penn–Del to investigate into reasonable accommodations is relevant to the Court's analysis. *See Taylor,* at 162–63.