

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-15-1999

# Klein v. Stahl Gmbh Co

Precedential or Non-Precedential:

Docket 98-3185

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Klein v. Stahl Gmbh Co" (1999). *1999 Decisions.* Paper 199.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/199

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed July 15, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 98-3185

JANET MARTIN KLEIN,
Appellant

v.

STAHL GMBH & CO. MASCHINEFABRIK AND
HEIDELBERG USA, SUCCESSOR-IN-INTEREST TO
HEIDELBERG EASTERN, INC.,
Appellees

On Appeal from the United States District Court
for the Western District of Pennsylvania
D.C. No. 95-448
Magistrate Judge: Honorable Kenneth J. Benson

Argued March 22, 1999

Before: GREENBERG and ROTH, Circuit Judges and
POLLAK, District Judge*

(Filed July 15, 1999)

Timothy D. Appelbe (argued)
The Bank Tower, Suite 1208
307 Fourth Avenue
Pittsburgh, PA 15222

_____

* Honorable Louis H. Pollak, United States District Judge for the Eastern
District of Pennsylvania, sitting by designation.

Michael J. Bruzzese
The Bank Tower, Suite 1201
307 Fourth Avenue
Pittsburgh, PA 15222
Attorneys for Appellants

Mark C. Schultz (argued)
Cozen & O'Connor
200 Four Falls Corporate Center
Suite 400
West Conshohocken, PA 19428

Charles Kirshner
Margolis Edelstein
1500 Grant Building
Pittsburgh PA 15219
Attorneys for Appellees

OPINION OF THE COURT

POLLAK, District Judge

This products liability case was commenced in a Pennsylvania state court and was then removed, on grounds of diversity, to the District Court for the Western District of Pennsylvania. After discovery had begun under the supervision of a Magistrate Judge, the parties agreed to have the Magistrate Judge take full charge of the case with responsibility for its disposition. Thereafter, the Magistrate Judge granted summary judgment in favor of defendants. From that judgment plaintiff has appealed.

In granting summary judgment, the Magistrate Judge concluded that a party who has asserted conflicting factual positions in two different affidavits has done so in bad faith and should be barred by judicial estoppel from adopting the second position, even where the parties and the Magistrate Judge recognize that the second position is more likely truer to the underlying facts. We find that the Magistrate Judge abused his discretion by (1) invoking judicial estoppel without considering the sufficiency of less extreme sanctions that he might have found available under the Federal Rules of Civil Procedure or federal statutes, or

2

under the court's inherent power, and (2) determining that the fact that a party has espoused two inconsistent positions is, without more, conclusively demonstrative of bad faith. We will therefore vacate the judgment entered by the Magistrate Judge and remand for further proceedings.

I. Facts

Plaintiff Janet Klein worked for a Pittsburgh printer, where she operated a commercial printing machine known as a "buckle folder," which folded paper and trimmed it as it flowed out of the machine. The parties agree that, at least if improperly used, several parts of the buckle folder are capable of causing injury. There is an "upper slitter," which is a rotating shaft equipped with cutting knives, located above the level of the output table, and there is a "lower slitter" of somewhat different construction below the table. The two are not far apart.

Though the folded paper flowed onto a "delivery table," the machine did not include a depository for the trimmed paper scraps. Klein and her co-workers generally placed cardboard boxes on the floor below the place from which the paper flowed. The paper scraps fell into the boxes in what the plaintiff describes as a "pillar-like effect," and when the pillar of paper scraps built up to the part of the machine in which the rotating shafts and knife blades were located, Klein would pat the pillar down. On February 22, 1992, when Klein was reaching to pat a pillar down, her hand made contact with part of the machine and was seriously injured.

II. Procedural History

Klein sued the machine's manufacturer (Stahl GMBH & Co. Maschinefabrik) and its American distributor (Heidelberg USA) in state court, alleging that she had "attempted to clear scrap paper that had accumulated underneath the machine when her right hand became trapped in the unguarded and unprotected folding rollers." Complaint P4. The defendants removed the case to federal court on diversity grounds, and the District Judge to whom the matter was assigned referred the case to a Magistrate

3

Judge for the conduct of the pretrial phases of the litigation.

The defendants filed a motion for summary judgment on June 17, 1996 ("first summary judgment motion"), asserting that the machine had been built and distributed with "a barrier guard protecting the nip point between the slitter shaft and the shaft below it." A104. Klein responded to the motion by arguing that there had never been a barrier guard on the machine during her year and a half on the job. She argued in the alternative that if there ever had been a guard, "it interfered with the efficient operation of the machine and it was never identified as a guard or other type of safety device." Pl. Br. at 6.

Klein's last contention in her response to the first summary judgment motion set the direction for much of the pre-trial practice that followed, and forms an important ingredient of the subject of this appeal. Klein argued that a barrier guard -- even if one had been present on the machine and did not interfere with its operation-- would not have prevented her injury "because she was injured on the upper slitter shaft, not at the location of the lower slitter shaft and drive shaft where the guard was designed to be installed." Id. In support of this last statement, Klein attached an affidavit dated July 10, 1996 in which she swore that "[e]ven if the [barrier guard] had been in place before my accident it would not have prevented my accident because my hand made contact with the upper slitter shaft located above the area where the [barrier guard] is located . . . ." A149-50 (hereinafter the "first affidavit").

Surprised by Klein's contention that she had been injured through contact with the upper slitter shaft-- not the lower slitter shaft, where they had presumed the injury had occurred -- the defendants, by letter, informed the Magistrate Judge that there was some likelihood that Klein's response had rendered the summary judgment motion moot and requested twenty days in which to "investigate whether [they] wish[ed] to file a reply brief or take some other action." A151. The Magistrate Judge granted the request. A153. The defendants subsequently decided not to file any further response to the summary judgment motion. On November 15, 1996, the Magistrate

4

Judge ruled on the defendants' first motion for summary judgment:

> . . . counsel for defendants having sent the court a letter . . . asserting that the facts presented in the response to the motion may result in the motion being rendered moot . . . [and] it appearing to the court that defendants' motion for summary judgment has been rendered moot by these developments;
>
> IT IS ORDERED that the defendants' motion for summary judgment (Docket #17) is withdrawn as MOOT.

A176-77. The order made no mention of Klein's first two arguments -- that there had been no barrier guard affixed to the machine during the period that she operated the machine, and, alternatively, that if there was a guard or other safety device auxiliary to the machine it had not functioned properly and had not been properly labeled.

On January 27, 1997, the District Court, acting pursuant to the parties' agreement, assigned the case to the Magistrate Judge for disposition. Three days later, the defendants submitted three motions in limine, one of which sought "to preclude evidence of subsequent accidents/ incidents occurring on the same machine." A194-204. In particular, the defendants sought to preclude evidence of an accident suffered subsequent to Klein's accident by Carol Lamothe -- one of Klein's former co-workers-- on the same machine.[1] The motion relied chiefly on the following short excerpt from deposition testimony that Lamothe had given in a case that she had also brought against Stahl and Heidelberg:

> Q. If I asked you to point on one of these photographs to the place where your hand got caught, could you do that or no?
>
> A. No, I could not.

A195; see also A208. Defendants argued that the deposition testimony showed "that there is no evidence that Ms. Lamothe caught her hand in the same location where

_____

1. The same attorney represented both Klein and Lamothe.

the plaintiff in the case at bar alleges that she caught her hand." A195. Because Lamothe did not know precisely where her hand was caught, and Klein had averred in her first affidavit that her "hand made contact with the upper slitter shaft," A150, defendants contended that evidence of the Lamothe accident was not probative, or at least was more prejudicial than probative. A196.

The Magistrate Judge granted the motion and precluded the evidence. A218. Relying on Barker v. Deere & Co., 60 F.3d 158 (3d Cir. 1995) -- which holds that a "district court must be apprised of the specific facts of previous accidents in order to make a reasoned determination as to whether the prior accidents are `substantially similar' " and thus admissible in evidence -- the Magistrate Judge reasoned as follows:

> [Lamothe stated] that she cannot point to the place on the machine where her hand got caught. Plaintiff has described with some specificity where her hand got caught in the machine. She states that she was patting down paper which had accumulated in a box adjacent to the machine, and that her hand got caught in the "upper slitter shaft." Plaintiff has presented several pages from Ms. Lamothe's deposition in which she states that she was patting down scrap paper, and that her hand got caught in the machine, but that she is not sure where it got caught. On the evidence presented, it is not clear that the accidents occurred in "substantially similar" circumstances . . . .

A216 (citations to record omitted).

Klein subsequently learned through discovery that several other accidents had occurred on the same machine. The defendants, apparently aware that Klein had learned this information, filed a new motion in limine on June 17, 1997, seeking to preclude evidence of these accidents. A219-21. On the same day, the defendants filed a separate motion in limine, seeking to preclude Klein's expert witness from testifying about the guard on the lower slitter shaft or guards that Stahl was then developing. A9. In the new motion in limine seeking to preclude evidence of other accidents on the same machine, the defendants argued that

6

preclusion of evidence of other accidents was necessary because Klein had not demonstrated that the accidents were substantially similar to her own accident. A220. Of the six accidents, three had occurred through contact with the lower slitter; other than one accident -- in which the victim had not described the point of contact -- none involved the upper slitter. A223.

Klein's counsel responded to both of the June 17, 1997 motions in limine with one memorandum. See A10. The memorandum addressed the issue of evidence of other accidents by changing the factual averments that Klein had made in her first affidavit. Specifically, Klein's memorandum in opposition stated that:

> At the time of contact between the plaintiff 's hand and the machine, the plaintiff was not in a position where she could have seen the precise location on the machine where her hand was injured. The general area of the machine where the accident occurred contains five shafts, four of which rotate. The shafts are all within approximately one foot of each other. In normal operation, the view of the rotating shafts is blocked by a delivery table onto which product is fed from the production end of the folder. The area is illuminated only by ambient light, with light from overhead blocked by the delivery table. At the time of her accident, the plaintiff's view of the area would have been further obstructed by scrap paper which had built up from a cardboard box situated on the floor all the way up to the area of the rotating shafts. The plaintiff, even if she had been attempting to locate the area where her hand eventually made contact with the machine, would have been unable to do so. Naturally, when contact with the machine occurred, her primary focus was on extricating her hand, not attempting to pinpoint precise parts of the machine causing the lacerations for purposes of future litigation.

A230-31. Moreover, the memorandum indicated that Klein had "not set up the machine" and "was not trained or skilled in setting up the machine and was never asked to do so. Her familiarity with the parts of the machine was, therefore, limited." A231. Perhaps recognizing that this shift

7

in factual averment might spark controversy, the memorandum went to some trouble to explain the shift:

> The plaintiff, at the time that she made her affidavit, understood that, at the time of her accident, the only rotating shaft equipped with slitters or cutting knives was the upper slitter shaft. Without being able to directly see what caused her injury, the plaintiff surmised, based upon information and belief, that the rotating slitters affixed to the upper slitter shaft had caused her injury.
>
> It should be noted that the upper and lower slitter shafts, based upon measurements made by the plaintiff 's expert, are located less than one inch from each other. Based upon her understanding that the upper slitter shaft was the only one equipped with slitters at the time of her accident, the close proximity between the upper and lower slitter shafts, and her inability to see exactly what had caused her lacerations, the plaintiff's affidavit was supported by a reasonable belief that the upper slitter shaft was the culprit.
>
> At the time of her affidavit the plaintiff was unaware that the edges of the collars of the lower slitter shaft were also capable of causing the types of lacerations that she sustained.

A231 (record citations and footnote omitted). Describing the progress of discovery, the memorandum suggested-- but did not expressly state -- that Klein had learned details about the buckle folder that caused her to change her factual averment.2 The memorandum did, however, assert

_____

2. Plaintiff 's brief before this court is considerably less indirect:

> Following the submission of [Klein's first] affidavit, the depositions of William Klein and Ronald Bereksazi were taken on November 4, 1996 in connection with [Lamothe's] case . . ... The testimony of the deponents in that case revealed for the first time that the inside edges of the collars on the lower slitter, when rotating at high speeds, could cause the type of injury sustained by the plaintiff. Faced with the information that the collars which were attached to the lower slitter shaft at the time of the accident were sharp enough,

8

that "the defendants have consistently maintained that . . . [Klein's injury] had to have occurred between the lower slitter shaft and the drive shaft." A233. As evidence of that assertion, the memorandum pointed to a report by the defendants' corporate designee3 and the defendants' engineering expert.4 Given Klein's new factual averment, the memorandum argued, the six accidents were, manifestly, "substantially similar" to Klein's accident, thus requiring denial of the motion in limine. A233-34. The memorandum argued further that the court should reconsider its order granting defendants' earlier motion in limine to preclude evidence of the Lamothe accident. A234-36.

The memorandum seemed simultaneously to maintain that Klein had not changed her position:

> The plaintiff has always acknowledged that her injury occurred at the production end of the machine which contains a complex of four rotating shafts. She has never stated that she actually saw the precise location on the machine where her hand was injured. She was simply not in a position to do so at the time of her accident. . . . She has made a reasonable assumption, upon which her affidavit is based, that the slitting knives on the upper slitter shaft caused her injury.

A234. In support of the proposition that Klein's position had not changed, the memorandum reminded the court that

> The plaintiff has also proceeded on the alternative theory . . . that if her hand was injured at the location on the machine where the defendants insist it must

_____

> when rotating at high speeds, to lacerate her hand, the plaintiff could no longer state with certainty that her hand had made contact with the upper slitter shaft at the time of the accident.

Pl. Br. at 10-11.

3. "Based on the deposition of both Ms. Martin and Ms. Lamothe, their injuries must have occurred between the lower slitter shaft and the shaft below it." A233.

4. "It is most probable that [Klein] became involved between the lower slitter collars and the drive shaft." A233.

9

have been injured, the in-running nip point between the lower slitter shaft and the drive shaft, and if the machine came equipped with a guard at the time it was distributed to Hoechstetter, her employer, then it was entirely foreseeable . . . that the guard would be removed.

Id.

Klein's memorandum in opposition was supported by an affidavit in which Klein swore that "[w]hen I made the statement in my affidavit of July 10, 1996, that my injury occurred on the upper slitter shaft, I made that statement in the good faith belief that it was true." A394. The affidavit tracked the memorandum in its explanation of why Klein originally thought the injury occurred on the upper slitter, and how she came to think differently. See A394-95. The affidavit concluded with Klein's statement that"I can now no longer say with any certainty exactly where at the output end of the machine my injury occurred." A395.

After the defendants filed a reply brief, the Magistrate Judge granted the motion in limine to preclude evidence of other accidents and denied plaintiff 's request for reconsideration. A277-83. The Magistrate Judge rejected Klein's contention that she had been "proceeding under alternate theories of how her injury occurred, i.e., either that it occurred at the upper slitter shaft, or that it occurred at the lower slitter shaft," A280, and found that plaintiff had changed her position. Without mentioning the doctrine of judicial estoppel or any finding that he might have made as to the disingenuousness of Klein's change of position, the Magistrate Judge held that "at this stage, plaintiff cannot be heard to assert that her injury occurred at any point on the machine other than the upper slitter shaft." A280.

Several months later, on December 29, 1997, the defendants moved again for summary judgment (the "second summary judgment motion"). Aside from a recitation of the procedural background and the applicable legal standards, the brief contained only two paragraphs. In full, those paragraphs stated:

10

Plaintiff alleges that her injuries occurred at the upper slitter shaft. The affidavit of Severino Roderick, attached hereto as exhibit "B", establishes that the upper slitter shaft is not capable of causing injury, as the exposed nip point is out running. It further would have been physically impossible for plaintiff to reach this point based on her description of her activities at the time of her injury.

At this point, this fact is undisputed, and the burden is on plaintiff to produce contrary evidence by way of affidavit or deposition. It would be a waste of judicial resources to conduct a trial on a theory which is physically inconsistent with the undisputed facts, and defendants' motion should be granted.

A287-88 (emphasis in original).

Klein's memorandum in opposition to the motion for summary judgment began by reiterating Klein's explanation of why her change in position had been the result of new information legitimately acquired during discovery. A298-99. Klein did not dispute that her injury could not have been caused by the upper slitter. The memorandum noted that "[t]he basis for the defendants' Motion is not entirely clear," A299, but hypothesized two possible bases for the second motion for summary judgment: the first involved Pennsylvania's substantive law of products liability, and the second was "that the defendants are entitled to summary judgment because they have demonstrated that the plaintiff Janet Klein is not infallible," A299 -- apparently meant as a reference to Klein's change in factual averments. As to the second, the memorandum stated:

The defendants seem to be arguing that, although they (the manufacturer and distributor of this machine) know that Janet Klein could only have been injured on the lower slitter shaft, judgment should be entered in their favor because Janet Klein mistakenly stated that she was cut on the upper slitter shaft, based upon an assumption that knives [present on the upper slitter] cut and collars [present on the lower slitter] do not. In other words, because Janet Klein might have made a mistake in identifying the location of her injury in an affidavit, they are entitled to judgment.

11

Such an argument might have some merit if the defendants could demonstrate some surprise leading to prejudice. However, the defendants cannot raise that argument because they cannot be surprised about something they claim they already knew. The cynicism is particularly virulent when considering that, in connection with defendants' Motion In Limine to exclude evidence of the Lamothe accident, they argued that evidence of the Lamothe accident could not be admitted in this case because the accidents were not substantially similar, Klein's accident occurring in what she "claimed" was the upper slitter shaft. As early as that time, it is now obvious that the defendants knew that, based upon their superior knowledge with respect to the workings of this machine, Klein's accident, as described by her and demonstrated in her deposition, could have only involved the lower slitter shaft, not the upper slitter shaft.

A300.

Oral argument on the motion was held on February 3, 1998. Klein's counsel began by describing the defendants' argument that they were entitled to summary judgment by virtue of Klein's change in position as "absurd and cynical." A332. He proceeded to address what he saw as "the real issue," which involved substantive Pennsylvania products liability law. A332-33. Counsel then returned to defendant's `absurd' argument, which he summarized as being:"we know what happened, but you aren't allowed to prove it, so we win." A334. He then explained to the court the way in which the progress of discovery had revealed facts to Klein that led her to change her factual position, A334-42, stating that Klein had sworn to her first affidavit "[i]n good faith." A338. The Magistrate Judge remarked that he thought it appropriate to reconsider his first summary judgment motion when deciding the second motion for summary judgment. A344-46.

Before the Magistrate Judge adjourned the proceedings, plaintiff 's counsel made "a few comments on the estoppel issue." A349.

I'm not clear on what that means. I've never been involved in a case where somebody makes a good faith

12

but erroneous statement under oath, and I always thought that was a matter for cross examination. I've never heard of it causing a default by the plaintiff.

The plaintiff is going to have to get up and testify to what she knows, and then she's going to be confronted by [defense counsel] with the [first] affidavit, and she's, she's going to give her explanation . . . .

A349. In response, the Magistrate Judge explained to plaintiff 's counsel that defense counsel was"arguing judicial estoppel." Id. The Magistrate Judge then explained his understanding of the law of judicial estoppel. A350-53. He did not use the term "bad faith." He acknowledged that plaintiff 's counsel had "argue[d] alternatively throughout" -- i.e., argued that if the accident had occurred at the lower slitter the barrier guard allegedly installed was improperly designed, or that the accident had occurred at the upper slitter -- but stated that the conflict between Klein's first and second affidavits might nonetheless require him to apply judicial estoppel. A351-52.

The Magistrate Judge issued his opinion granting the second summary judgment motion one week later, on February 10, 1998. The central question he addressed was whether Klein should "be judicially estopped from now asserting that her hand was caught in the lower slitter shaft?" A315. To answer that question, the Magistrate Judge set forth what he believed to be the threshold inquiry for the application of judicial estoppel: " `(1) Is the party's present position inconsistent with a position formerly asserted? (2) If so, did the party assert either or both in bad faith -- i.e., "with intent to play fast and loose" with the court?' " A315-16 (quoting McNemar v. Disney Store, Inc., 91 F.3d 610, 618 (3d Cir. 1996) (quoting Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 361 (3d Cir. 1996)). The Magistrate Judge thought that the first question had to be answered in the affirmative, because Klein's two affidavits directly conflicted. A316. He did not find it significant that, in her memorandum in opposition to the defendants' first motion for summary judgment, Klein had argued in the alternative -- either (1) there was not a barrier guard, or (2) the removal of the lower barrier guard was foreseeable or (3) she had injured her hand in the

13

upper slitter. The Magistrate Judge believed that the relevant conflict was not the conflict between the memorandum in opposition to the first motion for summary judgment and the memorandum in opposition to the second motion for summary judgment, but the conflict between the affidavit submitted in support of the memorandum in opposition to the first motion for summary judgment and the affidavit submitted in response to the defendants' second series of motions in limine. A316-17.

Having concluded that Klein's positions were inconsistent, the Magistrate Judge went on to consider whether Klein had assumed either of her positions in bad faith. He acknowledged that not all changes in position during litigation are undertaken in bad faith, but felt that this one was:

> In this case, however, plaintiff asserts that she was never sure where her hand contacted the machine, but simply assumed that it was the upper slitter shaft since she believed (mistakenly) that the lower slitter shaft could not have caused her injuries. This lack of assurance concerning how the accident occurred, however, is not reflected in plaintiff 's affidavit, or in counsel's argument in response to defendants' initial motion for summary judgment. Plaintiff 's statement is made without equivocation (not, for example, to the best of her knowledge and belief). If plaintiff was unsure where her hand came in contact with the machine, she could (and should) simply have said so. Instead, she stated as a fact, known to her, that her hand came into contact with the upper slitter shaft. Further, she did so with the intent that this representation would defeat the motion for summary judgment.

> In this case, the unequivocal nature of plaintiff 's affidavit and counsel's argument (not to mention the reliance of plaintiff 's expert on plaintiff 's affidavit) militate against a finding that she was previously unsure of the facts, and that she is now simply making clear was what [sic] left unclear before.

A317-18. The Magistrate Judge acknowledged that Klein asserted she had not sworn to either affidavit in bad faith,

14

but stated that "[i]n the context of judicial estoppel . . . bad faith is defined as playing [fast] and loose with the court." A319. The Magistrate Judge thought that Klein had `played fast and loose' with the court by attesting, in her first affidavit, "to a version of the facts which she knew was not accurate." Id. (The Magistrate Judge implied that, had Klein conditioned her first affidavit –- e.g., by introducing it with words such as "to the best of my knowledge and belief " –- he would not have found that she had `played fast and loose' with the court. A318–19.) Accordingly, Klein was held by the Magistrate Judge to be judicially estopped from arguing that her hand was injured in the lower slitter. Since Klein had not produced any evidence refuting the defendants' claim that her hand could not have been injured in the upper slitter, the Magistrate Judge granted summary judgment. A319–20, 324.

Before concluding his opinion, the Magistrate Judge made it plain that granting summary judgment was not an easy course to pursue. A320. He noted that "[t]he reader may well wonder how plaintiff can be put out of court when, after all, she is now simply trying to prove that she was injured precisely where defendants have consistently maintained she must have been injured." Id. 5 To justify invoking judicial estoppel despite his "real reluctance," the Magistrate Judge returned to what he saw as the underlying rationale of judicial estoppel: it "is designed to avoid the type of unnecessary litigation the parties and this court have just gone through." Id.

> Had plaintiff 's affidavit been accurate (e.g., had it
> stated that she was unsure where her hand contacted
> the machine, but assumed that it was in the area of
> the upper slitter shaft), the efficient administration of

_____

5. After granting summary judgment, the Magistrate Judge explained at some length what would have happened if Klein had stated in her first affidavit that she was not sure where her hand had made contact with the buckle folder, A321–24, concluding that Klein's "claim would have survived summary judgment." A321. The Magistrate Judge made it plain that, even if Klein had not claimed in her first affidavit that she injured her hand in the upper slitter, he would have found that Klein's argument that the removal of the barrier guard was foreseeable precluded summary judgment. A323–4 & n.1.

15

this case would have been promoted. As it is, the inaccuracy which plaintiff alleges exists in her earlier affidavit has caused this court to once again revisit summary judgment instead of proceeding timely to trial.

A321.

Plaintiff filed a motion to alter or amend the judgment, A434-35, to which defendants responded, A446-48. The Magistrate Judge denied the motion. A12. Klein then timely appealed under 28 U.S.C. S 1291.

III. Standard of Review

We review the application of judicial estoppel under an "abuse of discretion" standard. McNemar v. Disney Store, Inc., 91 F.3d 610, 613 (3d Cir. 1996), cert. denied, 510 U.S. 1115 (1997). We exercise plenary review over a grant of summary judgment. Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 358 (3d Cir. 1996).

IV. Discussion

A. The Sequential Order of Use of Sanctions

As the Magistrate Judge correctly noted, this circuit's "doctrine of judicial estoppel is an equitable doctrine which vests considerable discretion in the court." A315 (citing McNemar v. Disney Store, Inc., 91 F.3d 610, 617 (3d Cir. 1996)). Proper exercise of that discretion requires the court to focus attentively on the particularly distinctive features of the case before the court, since "each case must be decided upon its own particular facts and circumstances." McNemar, 91 F.3d at 617 (citing Ryan Operations, 81 F.3d at 360).[6] There are, therefore, few overarching principles about the proper application of judicial estoppel that cover all cases. But some generalizations can be ventured: "judicial estoppel is an `extraordinary remed[y] to be
_____

6. Cleveland v. Policy Management Systems Corp., 119 S.Ct. 1597 (1999) casts doubt on the particular holding in McNemar, but it does not call into question the principles stated in McNemar which we quote.

16

invoked when a party's inconsistent behavior will otherwise result in a miscarriage of justice.' " Ryan Operations, 81 F.3d at 365 (citing Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414, 424 (3d Cir. 1988) (Stapleton, J., dissenting)). Further, as we learn from case law dealing with other forms of judicial sanctions, a trial court should consider invoking its inherent sanctioning powers only where no sanction established by the Federal Rules or a pertinent statute is "up to the task" of remedying the damage done by a litigant's malfeasance, Chambers v. NASCO, Inc., 501 U.S. 32, 50 (1991), and only then when the sanction is "tailored to address the harm identified," Republic of the Philippines v. Westinghouse Elec. Corp., 43 F.3d 65, 73 (3d Cir. 1995).

Judicial estoppel is one arrow in the quiver of sanctions at a court's disposal. Each of those arrows is a defensive weapon, loosed to protect the integrity of the court's processes. See Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991) ("A primary aspect of [a district court's] discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process."); McNemar v. Disney Store, Inc., 91 F.3d 610, 616 (3d Cir. 1996) ("[t]he doctrine of judicial estoppel serves a consistently clear and undisputed jurisprudential purpose: to protect the integrity of the courts."). A trial court should avail itself of its inherent sanctioning power only when absolutely necessary. As the Supreme Court has said, "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." Chambers, 501 U.S. at 44.

In Chambers, the Court addressed a district court's decision to require a plaintiff who had engaged in repeated and varied misbehavior to pay almost a million dollars to defendant to defray defendant's attorney's fees and related litigation expenses. Writing for the Court, Justice White noted that a federal court is not "forbidden to sanction bad-faith conduct by means of the inherent power simply because that conduct could also be sanctioned under[a federal] statute or the Rules." 501 U.S. at 50. He warned that "[a] court must, of course, exercise caution in invoking its inherent power, and it must comply with the mandates of due process . . . in determining that the requisite bad

17

faith exists . . . ." Id. Thus, "when there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power." Id. But "if in the informed discretion of the court, neither the statute [28 U.S.C. S 19277] nor the Rules are up to the task, the court may safely rely on its inherent power." Id. Justice White's statement of general principle -- that a court may rely on its inherent power where "neither the statute nor the Rules are up to the task" -- was followed directly by an application to the case then at bar that sheds light on the principles themselves:

> It is true that the District Court could have employed Rule 11 to sanction Chambers for filing "false and frivolous pleadings," 124 F.R.D., at 138, and that some of the other conduct might have been reached through other Rules. Much of the bad-faith conduct by Chambers, however, was beyond the reach of the Rules; his entire course of conduct throughout the lawsuit evidenced bad faith and an attempt to perpetrate a fraud on the court, and the conduct sanctionable under the Rules was intertwined within conduct that only the inherent power could address. In circumstances such as these in which all of a litigant's conduct is deemed sanctionable, requiring a courtfirst to apply Rules and statutes containing sanctioning provisions to discrete occurrences before invoking inherent power to address remaining instances of sanctionable conduct would serve only to foster extensive and needless satellite litigation . . . .

Id. at 50-51. The foregoing suggests that the Rules are not "up to the task" when they would not provide a district

_____

7. 28 U.S.C. S 1927 provides that:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

18

court with the authority to sanction all of the conduct deserving of sanction.8

When the Rules or pertinent statutes are "up to the task," they should be used.9 When they are not, a trial court may turn to its inherent sanctioning power, but should exercise that power with caution.10  Within that inherent sanctioning power, judicial estoppel is often the harshest remedy. Cf. Poulis v. State Farm Fire & Casualty Co., 747 F.2d 863, 867, 870 (3d Cir. 1984) (characterizing dismissal sanction as "extreme"). The Magistrate Judge in this case evidently thought himself confronted by an all-or-

_____

8. Such an interpretation gains credence from the views of the dissenters in Chambers. Justice Scalia noted that he had "no doubt of a court's authority to go beyond the Rules in [the circumstances of the case]. And I agree with the Court that an overall sanction resting at least in substantial portion upon the court's inherent power need not be broken down into its component parts, with the actions sustainable under the Rules separately computed." Id. at 60. Justice Kennedy, joined by Chief Justice Rehnquist and Justice Souter, dissented on the ground that district courts could justify invocation of inherent sanctioning powers only where they can detail "special justification"; i.e., where a federal statute or Rule does not cover the misbehavior in question and where the court must sanction that misbehavior in order to safeguard its own functioning. Id. at 63. All nine Justices thus agreed on the minimum proposition that a federal district court considering sanctions should first turn to the Federal Rules and applicable statutes.

9. Our prior decisions support this view. See Gillette Foods Incorp. v. Bayernwald-Fruchteverwertung, GmbH, 977 F.2d 809, 814 n.10 (3d Cir. 1992) (assuming that a district court should consider the Federal Rules and applicable statutes before turning to its inherent powers); In Tutu Wells Contamination Litigation, 120 F.3d 368, 183 n.13 (3d Cir. 1995) (describing Chambers as having "observed . . . that normally a court should look first to those rule-based or statute-based powers before turning to its inherent powers").

10. We noted in In re Tutu Wells Contamination Litigation that the fact "[t]hat `inherent powers are shielded from direct democratic controls' makes [the] exercise of restraint and discretion even more important." 120 F.3d 368, 383 (3d Cir. 1995) (citing Roadway Express, Inc. v. Piper, 447 U.S. 752, 764 (1980)). By contrast, statutes are direct expressions of the people's representatives in Congress, and the Federal Rules -- though drafted by committees of the Judicial Conference composed of members of the bar, academia, and judges -- are subject to veto by Congress.

nothing choice: dealing with what he saw as bad faith through the invocation of judicial estoppel, or ignoring that bad faith. In electing to invoke judicial estoppel, the Magistrate Judge foreclosed a plaintiff with a potentially meritorious claim from presenting her case in court.

Had the Magistrate Judge first asked whether the Rules were "up to the task," he might not have found himself confronting such a stark choice. The Federal Rules present a district court encountering perceived bad faith with less severe sanctions, such as the remedial sanction set forth in Rule 56(g), which vests a court with authority to charge the misfeasant with expenses, including attorney's fees, attributable to the additional litigation generated by a bad-faith affidavit -- and, where appropriate, to adjudge the misfeasant guilty of contempt.11 Such a sanction allows a court to penalize disingenuousness without foreclosing a potentially meritorious claim.

Had the Magistrate Judge concluded that invoking the court's inherent sanctioning authority was preferable to use of Federal Rules or statutes -- either because the Rules and statutes did not cover a particular person or a particular act, or because misfeasance sanctionable under the Rules was intertwined with misfeasance not sanctionable under the Rules -- he would still have had available the full range of sanctions within the inherent power. A court choosing among such sanctions must "ensure that the sanction is tailored to address the harm identified." Republic of the Philippines v. Westinghouse Elec. Corp., 43 F.3d 65, 73 (3d Cir. 1995).

_____

11. Rule 56(g) states:

    Should it appear to the satisfaction of the court at any time that any
    of the affidavits presented pursuant to this rule are presented in bad
    faith or solely for the purpose of delay, the court shall forthwith
    order the party employing them to pay to the other party the
    amount of the reasonable expenses which the filing of the affidavits
    caused the other party to incur, including reasonable attorney's
    fees, and any offending party or attorney may be adjudged guilty of
    contempt.

B. Bad Faith Inquiry Prior to the Extreme Sanction of
      Judicial Estoppel

Judicial estoppel is not a sanction "tailored to address
the harm" if it does not, at a minimum, pass the"two-part
threshold inquiry" set out in Ryan Operations:

> (1) Is the party's present position inconsistent with a
> position formerly asserted? (2) If so, did the party
> assert either or both of the inconsistent positions in
> bad faith--i.e., "with intent to play fast and loose" with
> the court?

81 F.3d at 360 (citation omitted).

The Magistrate Judge appears to have believed that (1)
Klein knew when she swore to her first affidavit that she
was not sure where her hand was injured and (2) Klein
should have at least conditioned her first affidavit with
words such as "to the best of my knowledge and belief." By
considering Klein's initial failure to include conditional
language as per se evidence of bad faith, the Magistrate
Judge folded the second prong of the judicial estoppel test
back into the first prong -- merely asking, again, whether
the two affidavit positions were inconsistent. 12 As the
Magistrate Judge observed, judicial estoppel can be a
draconian sanction, one that should be invoked only with
"reluctance." Ryan Operations sought to give analytical
expression to that reluctance by requiring district courts to
find bad faith in addition to inconsistency.13

_____

12. Klein does not seriously contest that her statements were
contradictory. In her first affidavit, Klein asserted that her hand had
been injured on the upper slitter. In her second affidavit, she stated
that
she could no longer be certain where her hand had been injured. In
combination with her choice not to contest the defendants' argument
that it was physically impossible for her hand to have been injured on
the upper slitter, her second affidavit may be read to assert that she was
not injured on the upper slitter.

13. One need not read Ryan Operations's requirement for independent
evidence of bad faith to mean, as plaintiff argues, that a district court
must conduct an evidentiary hearing to determine whether a litigant has
acted in bad faith whenever the court is considering applying judicial
estoppel. There is no question that Ryan Operations stands for the

21

V. Conclusion

If on remand the court finds that Klein acted in bad faith -- a finding that must be based on more than inconsistency in factual positions -- the court should lookfirst to Federal Rules and statutes. E.g., Fed. R. Civ. Pro. 56(g). If no Rule or statute appears appropriate -- or if, as in Chambers, the perceived misbehavior combines some actions that are sanctionable under Federal Rules and statutes and some actions that are not -- then the court should turn to its inherent sanctioning power. If the court turns to its inherent sanctioning power, it should select a sanction "tailored to address the harm identified."

For the reasons set forth above, the order granting summary judgment will be vacated and the case remanded for further proceedings consistent with this opinion.

A True Copy:
        Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

_____

proposition that a district court must "discern" intent, not "infer" it. See 81 F.3d at 364. That does not mean, however, that Ryan Operations requires a district court to discern intent by way of an evidentiary hearing. The court in Ryan Operations did not consider a review of the record to be an improper way to discern intent; to the contrary, Ryan Operations assessed the appellant's intent by conducting its own review of the procedural history, rather than vacating the district court's finding of bad faith and remanding for an evidentiary hearing. Id. at 361–64. Moreover, the panel noted that in a predecessor case, Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414 (3d Cir. 1988), "there was ample evidence in the record from which an inference of deliberate manipulation could be drawn." Ryan Operations, 81 F.3d at 363. In whatever way a trial court chooses to inquire into bad faith, it must of course "comply with the mandates of due process." Chambers, 501 U.S. at 50. We are not called on today to map the boundaries of the due process right in a case of this kind.

22