**Robert G. LINCOLN, Plaintiff,**

v.

**MOMENTUM SYSTEMS LIMITED, Defendants.**

**No. CIV. A. 98–5064 (JEI).**

United States District Court, D. New Jersey.

March 1, 2000.

---

422

W. Austin Allen, II, Krzywicki & Associates, Lambertville, NJ, for Plaintiff.

Leslie A. Hayes, Eckert Seamans Cherin Mellott, LLC, Haddonfield, NJ, for Defendants.

## OPINION

IRENAS, District Judge.

Presently before this Court is defendant, Momentum Systems Ltd.'s motion for summary judgment on plaintiff Robert G. Lincoln's claim that he was illegally terminated from his job in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"), the New Jersey Law Against Discrimination, N.J.S.A. 10:5–1 *et seq.* ("NJLAD") and for breach of contract. For the reasons set forth below, defendant's motion for summary judgment is granted.

## I.

Plaintiff, Robert G. Lincoln, was hired for a telemarketing sales position with defendant Momentum Systems, Ltd. ("Momentum") in November of 1992 at an annual salary of $30,000 plus commissions. At that time, Lincoln was 58 years old. By January 1993, Lincoln was promoted to the position of sales representative for the

southeastern United States, one-third of Momentum's sales territory, and given a salary increase to $36,000 per year plus commissions. (Lincoln dep. 29). In 1992, all sales representatives [1] received a salary plus their commissions. After a couple of years, however, due to financial difficulties, Momentum became unable to pay its sales representatives a salary. Therefore, beginning in 1994, plaintiff was compensated for his work through his commissions alone. (*Id.* at 43–46). In July 1995, Lincoln relocated from New Jersey to North Carolina, which was part of his sales territory. (*Id.* at 31–34). According to Momentum, Lincoln was not successful as a sales representative for Momentum because he failed to reach the sales goal of $500,000 during the 1995 fiscal year. (Regina dep. 29). His total sales that year were $145,026.50.[2] (Shaw cert.). Momentum's then president, Len Yestal, gave plaintiff suggestions on how to improve his sales performance. (Lincoln dep. 62). In fiscal year 1995, plaintiff earned $24,197.67 in commissions; in fiscal year 1996, he earned $11,070.57 in commissions; and in fiscal year 1997 through March 31, 1997, plaintiff earned $11,380.93 in commissions. (Shaw cert.). Despite his alleged declining performance, plaintiff insists that during his entire course of employment at Momentum, he never received one unsatisfactory work evaluation, and he was never told that there was any problem with his job performance, skills or technical knowledge. (Lincoln dep. 61–63; Russella dep. 22–24).

According to Momentum, in April 1997, it obtained funding that enabled it to upgrade its product so that its software could be run on Windows NT, instead of only on Unisys hardware. (Russella dep. 29; Lincoln dep. 83–84). According to Momentum, because the product was much more sophisticated and technically complex, it made plans to expand its sales operation. Momentum began selling its new Windows NT product in September 1997, and began installing the new product later in 1998. (Russella dep. 31,50). According to Momentum, this funding and the new product allowed it to pay salaries to recruit highly skilled sales representatives. Therefore, beginning in June 1997, Momentum hired twelve [3] new account executives at a annual salary of $50,000 plus commissions, all with substantial computer knowledge and established track records in sales. (Shaw cert.; Corr dep. 50). In its submissions, Momentum also explains that since the second half of 1997, when it began to hire additional sales people, it divided up the sales territory into smaller areas, rather than just the original three. (Corr dep. 73).

In June 1997, plaintiff suffered a stroke which left him with residual problems with his enunciation and his mobility. His condition forced him to take a medical leave. Defendant continued to pay for his health and disability policy premiums. Over the next five months, Lincoln stayed in contact with defendant consistently expressed his hope to return to work. (Lincoln dep. 68–69). At that time neither Lincoln nor his doctors could say when Lincoln would be well enough to return to work. Over the summer, while Lincoln was out, Momentum's sales manager, Danielle Russella and its vice-president, Joe Regina, tried to maintain his accounts. (Lincoln dep. 83).

1. In 1997, Momentum began calling its sales representatives "account executives." At the same time, it began hiring entry level sales people for a different position called "account representatives" or "sales representatives." (Russella dep. 60–61).

2. To contrast plaintiff's low sales, defendant provides the sales figures of another account executive, Danielle Russella, who sold $315,-532.25 during 1995. (Shaw cert.).

3. At the time of hire, five of these twelve were under 40 and seven of twelve were above 40. Two of them were 57 or older at the time of hire. (Shaw cert.). This figure includes Momentum, the defendant in this action and those hired by Momentum Systems, a division of Maverick Momentum LLC, a different corporate entity which currently conducts business previously conducted by Momentum.

According to plaintiff, after he told Ms. Russella, his supervisor, that he expected to return to work soon, she said, "it will be good to have you back...." (Lincoln dep. 77).

In November 1997, after Lincoln was out for five months, Momentum concluded that it was too costly to leave Lincoln's territory open any longer. (Corr dep. 66–67). Momentum's president explained "We were at the point where we raised substantial capital, we had this new development under way, and simply couldn't take a third of the country or whatever it was and just ignore it." (*Id.* at 66–67). In addition, in October 1997, Momentum learned that Lincoln had applied for long-term disability benefits with his private insurer, the Principal Life Insurance Company ("Principal"). (Shaw cert.). His disability form indicated that according to his doctor, his prognosis was "totally disabled" and that it was "unknown" when he would be able to return to work. (Lincoln dep. 97–103; Pl.Ex. 15). Based on this, around November 10, 1997, Momentum hired Bill Reiter, age 48, and assigned him to the southern states previously covered by plaintiff. (Russella dep. 46–47). Momentum also hired George Horas, age 57, and assigned him to the mid-Atlantic territory, which included some of Lincoln's previous territory. (*Id.* at 47–48). According to Russella, Bill Reiter had extensive experience directly applicable to Momentum's new NT product and fourteen years of selling data communication. (*Id.* at 51). Reiter entered his position at annual salary of $50,000 plus commissions. (*Id.* at 49).

In January 1998, Lincoln provided information about his medical condition to Principal, his long-term disability insurance provider. In answering the questions: "What are your present limitations and symptoms? How do they prevent you from performing your usual job duties?", Lincoln wrote: "Limp, walk slowly, can't speak correctly, can't stand for long periods of time. Can't speak to clients correctly, and can't stand and make presentations." In response to the questions: "Have you discussed returning to work with your doctor? If yes, what was the doctors opinion?", Lincoln wrote: "Yes. Give it a year." (Def.Ex. H).

On February 13, 1998, Lincoln wrote to Momentum's president, Thomas Corr as a follow-up to their February 12, 1998 telephone conversation. In this letter plaintiff informed Corr that he would be able to return to work by May 4, 1998, or possibly in April 1998. (Def.Ex. 21). Plaintiff also listed the seventeen states that made up his territory prior to his stroke and the five states he believed he could handle with the "new product." (*Id.*) On March 2, 1998, Corr sent Lincoln a letter terminating his employment with Momentum for the stated reason "we [Momentum] had no idea if or when you would be able to return to work following your stroke. Because of that, we had to hire a replacement to cover your former territory and we do not have any other current openings."[4] (Def.Ex. 24).

4. Defendant concedes that in March 1998 there was an opening for an account executive for their west coast territory. However, because of their alleged concerns about Lincoln's physical ability to travel extensively and because Momentum concluded he was not qualified for one of the new account executive positions, there "was simply no place for Lincoln in the new sales force at Momentum." (Def. Brief at 11; Rossella dep. at 43). Lincoln's lack of qualifications was allegedly based on the fact that his skills were limited in contrast to the new executives; he had taken no courses and had no experience with Windows NT or on the Internet. (Corr dep. 51–52, 71–72).

According to plaintiff, he was a "highly skilled, knowledgeable and motivated salesperson." (Pl. Brief at 3). His resume indicates that prior to his five years at Momentum, he worked at ASI, a legal software firm where was responsible for demonstrating a customized PC-based computerized collection litigation system and developed marketing strategies for the system. He also worked as Assistant Vice–President and Senior Account Executive at Provident National bank of Philadelphia where he performed on-line comput-

According to Momentum, not until eight months had passed did plaintiff begin to look for a new job. At that time, he went to two employment agencies and applied for one position as a stocker in a grocery store. (Lincoln dep. 176–77). In January 1999, plaintiff moved to Kentucky for six months to assist his brother in his brother's business. (*Id.* at 9–11).

On May 8, 1998, Lincoln filed a charge with the Equal Employment Opportunity Commission ("EEOC"), alleging violation of the ADA and ADEA. (*See* Compl. Ex. A). On August 13, 1998, the EEOC issued a dismissal of Lincoln's charges and a right to sue notice, stating that "the EEOC is unable to conclude that the information obtained establishes violations of the statutes." (*Id.*) Plaintiff filed the instant lawsuit on October 30, 1998 requesting relief pursuant to the ADA, ADEA, NJLAD and state contract law. On October 29, 1999, Momentum filed the instant motion for summary judgment seeking dismissal of all of plaintiff's claims.

## II.

Under Fed.R.Civ.P. 56(c), a court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a a matter of law." The non-moving party may not simply rest on its pleadings to oppose summary judgment but must affirmatively come forward with admissible evidence establishing a genuine issue of fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In deciding a motion for summary judgment, the court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. American Tel. & Tel. Long Lines,* 794 F.2d 860, 864 (3d Cir.1986). The role of the court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III.

In counts one and three of his complaint, plaintiff alleges that Momentum terminated him from his employment due to his physical disabilities which included residual problems with speech, enunciation and mobility following a stroke in June of 1997. He asserts that Momentum's conduct in dismissing him constituted unlawful discrimination under the ADA and the NJLAD.[5] Momentum asserts that it is entitled to summary judgment on plaintiff's disability claims because plaintiff cannot establish that he was a "qualified individual with a disability" who could perform the essential functions of his job "with or without a reasonable accommodation." Momentum contends that plaintiff's request for an indefinite leave of absence as an accommodation was unreasonable as a matter of law. Defendant also asserts that even if plaintiff was qualified, his termination was caused by the fact that he did not have the professional skills necessary for the new account executive positions. Lastly, in a footnote, defendant argues that because plaintiff allegedly claimed he was "totally disabled" in order to receive

er demonstrations of the bank's PC payroll product and human resource system and as an Assistant Vice–President and Senior Marketing Representative for Mellon Bank, N.A. where he marketed a full line of automated computer services to commercial banks. (Pl. Ex. B).

5. As defendant indicates, ADA and NJLAD claims are governed by the same standards and the same analytical framework that deter-

mines claims of employment discrimination in violation of the ADA also applies to claims of discrimination on the basis of handicap under the NJLAD. *See Olson v. General Electic Astrospace,* 101 F.3d 947, 956 (3d 1996); *Van de Pol v. Caesars Hotel Casino,* 979 F.Supp. 308, 312 (D.N.J.1997); *see also Grigoletti v. Ortho Pharmaceutical Corp.,* 118 N.J. 89, 570 A.2d 903 (1990).

Social Security Disability Income ("SSDI") and disability benefits from his private insurer, he should be judicially estopped from bringing his disability claims. In response to these arguments, plaintiff suggests that not only was he "otherwise qualified" but that Momentum's reason for firing him—that he asked for an indefinite leave and/or that he did not have the professional skills—was really pretext for discrimination. Plaintiff did not respond to defendant's argument that he should be judicially estopped from bringing his disability claims.

■ The ADA prohibits an employer from discriminating "against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a). To establish a prima facie case of discrimination under the ADA, a plaintiff must demonstrate: (1) that he is a disabled person within the meaning of the ADA; (2) that he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation by the employer; and (3) that he has suffered an otherwise adverse employment decision as a result of the discrimination. *See Gaul v. Lucent Technologies, Inc.*, 134 F.3d 576, 580 (3d Cir.1998) (citing *Shiring v. Runyon*, 90 F.3d 827 (3d Cir.1996)). At issue here is prong two. Defendant does not challenge that Lincoln is disabled under prong one, but, asserts that he cannot meet prong two—that he is "otherwise qualified" to perform the essential functions of the job.

■ Under the ADA, it is a plaintiff's burden to show that he is an "otherwise qualified individual." *Gaul*, 134 F.3d at 580. The Court must consider first, "whether the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc," 29 C.F.R. pt. 1630, App. At 353–54; *Gaul*, 134 F.3d at 580, and second, "whether or not the individual can perform the essential functions of the position held or desired, with or

without reasonable accommodation." *Id.* "The determination of whether an individual is qualified is made at the time of the employment decision." *Dayoub v. Penn–Del Directory Co.*, 48 F.Supp.2d 486, 492 (E.D.Pa.1999) (citing *Gaul*, 134 F.3d at 580).

■ However, before addressing these considerations, the Court must review defendant's argument that plaintiff should be judicially estopped from bringing his disability claims. "Judicial estoppel 'is a judge-made doctrine that seeks to prevent a litigant from asserting a position inconsistent with one that [he or] she has previously asserted in the same or previous proceeding.'" *Erit v. Judge, Inc.*, 961 F.Supp. 774, 778 (D.N.J.1997) (quoting *Ryan Operations G.P. v. Santiam–Midwest Lumber Co.*, 81 F.3d 355, 358 (3d Cir.1996)). On February 7, 2000, prior to deciding defendant's motion, this Court ordered both parties to submit any and all documents related to plaintiff's claims for Social Security disability benefits and/or other types of disability benefits. In accordance with the Supreme Court's decision in *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 119 S.Ct. 1597, 1603, 143 L.Ed.2d 966 (1999), this Court further ordered that if any of these documents indicated that plaintiff filed an application for benefits claiming "total disability" or the like, he "must proffer a sufficient explanation" to resolve the conflict with his ADA claim. Pursuant to this letter, the parties submitted all of plaintiff's documents relating to his disability benefits and plaintiff submitted an affidavit with an explanation of any inconsistencies with his claim under the ADA. Defendant was permitted to respond to plaintiff's proffered reasons.

■ According to the Supreme Court's decision in *Cleveland*, 119 S.Ct. at 1599, if a plaintiff receives disability benefits after claiming he was "totally disabled" and unable to work, he may be judicially estopped from pursuing an action for disability dis-

crimination against his employer under the ADA claiming he could "perform the essential functions" of his job. *See also Motley v. New Jersey State Police,* 196 F.3d 160, 164 (3d Cir.1999) (applying *Cleveland*).[6] In *Motley,* the Third Circuit stated that "judicial estoppel may be invoked by a court at its discretion 'to preserve the integrity of the judicial system by preventing parties from playing fast and loose with the courts in assuming inconsistent positions....'" 196 F.3d at 163 (quoting *McNemar v. Disney Store, Inc.,* 91 F.3d 610, 617 (3d Cir.1996)).

■ In this case, defendant argues that plaintiff should be estopped from pursuing his disability claims because he has been receiving Social Security benefits since December 1997. (*See* Def. Brief at n. 14). In fact, in plaintiff's deposition, he admits that he applied and received Social Security benefits and disability benefits from Principal. In his affidavit, plaintiff testifies that although he remembers applying for retirement benefits with the Social Security Administration ("SSA") in the summer of 1997, he has no recollection of specifically filing a claim for SSDI benefits. (Pl.Aff.3,4). But, he states that he met with an agent at the SSA on August 16, 1997, who told him that his SSDI benefits would begin in five months. (*Id.*) He also admits that his records from SSA show that he filed a disability claim on July 30, 1997 and that it was approved on September 15, 1997. (*Id.* at 4). However, he states that at no time did he make representations to SSA that he was "fully disabled" due to his stroke. (*Id.*)

Plaintiff also concedes that he filed a claim for disability benefits with Principal on September 26, 1997, but states that he never indicated to Principal that he was "permanently or totally disabled." (*Id.* at 7). He states that he sent the necessary medical form to be filled out by his doctor,

Dr. Beamer. According to plaintiff, Dr. Beamer told SSA that plaintiff was "totally disabled," but, that he expected plaintiff "to make fundamental and marked changes in the future." (*Id.*) Plaintiff insists that he never saw Dr. Beamer's completed form until recently. (*Id.*) Plaintiff further states that on April 28, 1999, he informed an agent from Principal that he could return to work and perform the duties of his past job. (*Id.* at 8). Lastly, plaintiff testified that he did not know why he was receiving disability benefits after March 1998. (*Id.* at 9).

In its response, Momentum argues that Lincoln made representations in his disability claims that were entirely inconsistent with the statements he made to this Court. Specifically, defendant cites to Lincoln's deposition, where he said that he was cleared by his doctor to return to work without restrictions in January 1998. (Lincoln dep. 123–24). However, Momentum notes that on that same date, Lincoln was receiving monthly SSDI payments of $1,189 and was actively seeking long-term disability benefits from Principal. Momentum further asserts that Lincoln failed to tell Principal and SSA that he had recovered from his disability and in fact, continued to receive long-term disability benefits from Principal and SSDI benefits into 1999.

After reviewing the documentation on Lincoln's disability benefits and his affidavit about these benefits, the Court finds Momentum's arguments persuasive. According to Lincoln's social security forms, he applied for SSDI benefits in August 1997 and began receiving them in December 1997. (*See* Social Security questionnaire, LIN/MOM 063–069).[7] On August 7, 1997, a Disability Report was filled out on behalf of plaintiff, and signed by his daughter-in-law, Jacklyn Lincoln, and sub-

---

6. In *Motley,* 196 F.3d at 166 n. 5, the Third Circuit held that the *Cleveland* rule can also apply to claims brought under the NJLAD.

7. References to LIN/MOM followed by a number are the bates-stamp numbers of plaintiff's disability benefits documents submitted by the parties.

mitted to SSA. (*Id.* at 063–068). In response to "Explain how your condition now keeps you from working," plaintiff stated: "Paralyzed on the left side of the body affects walking, speech, left arm, at home I am in a wheelchair. When I go I use a 4-footed walker outside the home. I have lost my sense of balance." (*Id.* at 0063). On September 9, 1997, Lincoln's physician, Dr. Mark Beamer provided a "Disability Determination Evaluation" of plaintiff's medical condition in which he concluded: "Currently with this amount of weakness the patient cannot perform many job related activities. He definitely cannot stand for a long period of time, walk for intermediate or longer distances or perform fine dexterous movements with his left hand." (*Id.* at 009). In addition, all of plaintiff's medical records relating to his stroke were requested by Disability Determination Services, a company that provides disability evaluation services for SSA. (*See id.* at 0033–0061).

Moreover, on September 26, 1997, Lincoln applied for longterm benefits from his private insurer, Principal. (*Id.* at 113). In the "Attending Physician Statement" of this form, Dr. Beamer checked "Yes" in response to the question, "Is patient now totally disabled?" (*Id.* at 114). Dr. Beamer also checked "Yes" in answering, "Do you expect a fundamental or marked change in the future," however, wrote "unknown" to answer the follow-up question, "If yes, when will/or did patient recover sufficiently to perform duties?" (*Id.*) In his affidavit, Lincoln denies knowing the content of Dr. Beamer's statement. However, three months later, on January 8, 1998, (the exact date plaintiff gave in his deposition that he was cleared to return to his job without restrictions), he provided contradictory information to Principal in a Supplemental Information For Group Disability Claim" form. (*Id.* at 115–121). In this form, Lincoln claimed he was "unable to write," and in response to "What are your present limitations and symptoms? How do they prevent you from performing your usual job duties," he stated: "Limp,

walk slowly, can't speak correctly, can't stand for long periods of time. Can't speak to clients correctly, and can't stand and make presentations." (Id. at 119). In response to "Have you discussed returning to work with your doctor? If yes, what was the doctor's opinion," Lincoln stated, "Yes. Give it a year." (*Id.*) On February 10, 1998, his long-term disability claim was approved by Principal. (*Id.* at 105). Lincoln received long-term disability benefits from Principal because it believed that he had a "Total Disability" which it defined as "unable to work at the duties of [his] normal job." (*Id.* at 105). On March 7, 1999, one-year after he was terminated from Momentum and at least one year from the time he could have allegedly returned to work without restrictions, plaintiff was still receiving and actively pursuing these long-term disability benefits. (*See id.* at 100). In fact, on April 12, 1999, in response to a letter from Principal requesting that Lincoln provide medical information relating to his benefits, Lincoln wrote: "I estimate my recovery will last another four or five months then I should be ok. . . . Social security will allow me another six-month trial period before I lose my disability and go to retirement benefits." (Id. at 98). Finally, after reviewing plaintiff's materials, Principal denied plaintiff's claim for long-term disability benefits after June 16, 1999 and stated "we do not feel you continue to meet the definition of Total Disability." (*Id.* at 94).

Based on the above, the Court finds that Lincoln is judicially estopped from bringing his disability claims against Momentum under the ADA and the NJLAD. The Court finds that Lincoln's sworn statement that his doctor cleared him to return to work without restrictions on January 8, 1998 is critical to this case. In a claim under the ADA or the NJLAD, that statement tells the Court that plaintiff could have performed the essential functions of his job on that day. There is sufficient evidence in the record to show that Lincoln not only made direct contradictory

statements to Principal about his medical condition and level of disability on the very same day, but that he received and continued to receive disability benefits from Principal and SSDI for at least one year following that date. Plaintiff contends that he does not remember filling out forms for SSDI, however, he received checks from them for over a year. Lincoln also specifically acknowledged receiving SSDI disability benefits in his April 1999 letter to Principal described above. Furthermore, the Court finds the most convincing factor to be that plaintiff quite actively and knowingly pursued long-term disability benefits from Principal well into 1999.[8] While plaintiff states in his affidavit that he never told Principal he was "totally disabled," all of the paperwork Principal sent plaintiff indicates that in order to collect long-term disability benefits, a claimant had to be "totally disabled." In addition, both plaintiff and his doctor made representations to Principal that he was unable to work. Whether or not plaintiff stated the exact words "I am totally disabled" is irrelevant. All of Lincoln's actions and correspondence with Principal especially show clearly that he wanted them to believe that he was "totally disabled" so he could continue collecting long term disability benefits. Morever, both SSDI and Principal require claimants to inform them if their medical condition has improved, which plaintiff never did. (*Id.* at 105); 20 C.F.R. 404.1588. Hence, if plaintiff was really ready to perform the essential functions of his job in January 1998 or even in the Spring of 1998, the Court wonders why he continued to pursue and accept SSDI and Principal disability benefits into 1999. The Court finds that plaintiff cannot be simultaneously unable to perform his job due to his disability and at the same time able to perform the essential functions of his job in order to make out his disability claims. Accordingly, plaintiff is judicially estopped from bringing his disability claims.

## IV.

Along with his disability claims, in counts two and three of his complaint, plaintiff charges Momentum with discriminating against him because of his age. Specifically, plaintiff alleges that "his former job responsibilities at [Momentum] were assumed, in part, by a younger employee or employees, upon information and belief, under the age of forty years." (Compl. at ¶ 34). Momentum argues that plaintiff has not put forth any evidence to support his allegations and in fact, plaintiff was primarily replaced by Bill Reiter, age 48, and George Horas, age 57.

■ The ADEA, 29 U.S.C. §§ 621–34, forbids an employer from discriminating against its employees over the age of forty on account of age. *See* 29 U.S.C. §§ 623, 631. Absent direct evidence of discrimination, age discrimination claims are subject to a similar but modified version of the burden-shifting rules articulated for race discrimination claims in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Simpson v. Kay Jewelers, Sterling Div., Inc.*, 142 F.3d 639, 644 n. 5 (3d Cir.1998); *Bergen Commercial Bank v. Sisler*, 157 N.J. 188, 723 A.2d 944, 955 (1999) (adopting the *McDonnell Douglas* approach as a starting point in analyzing claims under the NJLAD). Under *McDonnell Douglas*, as applied to claims under the ADEA, a plaintiff must prove that he: "(1) is a member of the protected class, i.e. at least 40 years of age, 29 U.S.C. § 631(a), (2) is qualified for the position, (3) suffered an adverse employment decision, and (4) in the case of a demotion or discharge, was

---

8. The Court holds that the *Cleveland* analysis is not limited to SSDI claims. Courts have barred disability discrimination claims where plaintiff has applied for and been receiving private or non-SSDI disability benefits at the time the alleged discrimination took place.

*See e.g., Motley,* 196 F.3d 160 (state pension funds); *Pena v. Houston Lighting & Power Co.,* 154 F.3d 267 (5th Cir.1998) (private long-term disability benefits); *August v. Offices Unlimited, Inc.,* 981 F.2d 576 (1st Cir.1992)(employer's disability insurance policy).

replaced by a sufficiently younger person to create an inference of age discrimination." *Simpson*, 142 F.3d at 644 n. 5; *Lawrence v. Nat'l Westminster Bank New Jersey*, 98 F.3d 61, 65 (3d Cir.1996). "Upon such a showing by the plaintiff, the burden shifts to the employer to produce evidence of a legitimate nondiscriminatory reason for the adverse decision." *Id.* (internal citations omitted). If defendant meets its burden, "the plaintiff must then demonstrate that the employer's articulated reason was not the actual reason, but rather a pretext for discrimination." *Id.* (internal citations omitted).

■ Plaintiff is a member of a protected class. He was 58 years old when he was hired in 1992 and 63 years old when he was terminated in 1998. He asserts that although Bill Reiter, age 48 took over much of his territory, various sales responsibilities were assumed by six new representatives who were all in their 20s and 30s and hired after plaintiff was terminated in March 1998. (Pl. Brief at 13, 17). Momentum contends and plaintiff does not dispute that not only was 48 year old Bill Reiter assigned to the heart of Lincoln's territory, but that Momentum also hired 57 year old George Horas in July 1997 and assigned him portions of Lincoln's territory as well. Furthermore, according to Jennifer Shaw, Momentum's controller, between the fall of 1997 and October 1999, "Momentum hired twelve account executives, five were of whom were under 40 and seven of whom were over 40 at the time of hire." (Shaw cert.). Shaw further testified that in 1999, Momentum did hire four individuals who were in their mid–20s but they were hired for the newly created entry-level position of "sales representative." (*Id.*) Plaintiff does not dispute any of Shaw's testimony.

Also undisputed is Momentum's explanation that while Lincoln was on medical leave, it revamped its internal structure with regard to its salespeople and shifted from a workforce with very few sales representatives to one with many account executives and lower level sales representatives, thus, plaintiff was not directly replaced by one individual. In any event, the Court is satisfied that 48 year old Bill Reiter, who took over much of plaintiff's territory as an account executive, is the individual who assumed most of plaintiff's former duties. The newly created sales representative positions appear to differ substantially from plaintiff's past position. Therefore, plaintiff has failed to meet his initial burden under the *McDonnell Douglass* analysis to make out a prima facie case under the ADEA.

However, even assuming that plaintiff has set forth a prima facie case for age discrimination, Momentum has offered a legitimate nondiscriminatory reason for its employment action. As explained above, it is undisputed that Momentum enjoyed a period of tremendous growth in the Fall of 1997 which allowed it to revamp its internal structure with regard to its salespeople and hire many new employees, including four inexperienced employees in their twenties that it could train as sales representatives.

■ Because Momentum has articulated a legitimate nondiscriminatory reason, the burden shifts back to plaintiff to demonstrate that defendant's proffered reason was pretextual. Plaintiff must be able to convince the factfinder "both that the reason was false, and that discrimination was the real reason." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir.1994) (internal quotations omitted). Plaintiff has not met this burden. Lincoln states that a comment made by Danielle Russella in her deposition creates a reasonable inference of discrimination:

Q. Have you hired any account representatives over the age of 40 in the last year [referring to 1999]?

A. No, but that would be somewhat unusual to hire an entry level person.

Q. Okay. Why is that?

A. We're typically looking for people who are kind of fresh and young who have no experience that we can mold into successful account executives.

(Russella dep. 61–62). Plaintiff asserts that this comment shows that Momentum had a strategy to "terminate older employees such as Mr. Lincoln" and instead hire all young employees. (Pl. brief at 13–14). But, "stray" remarks or an isolated comment are insufficient to establish discrimination. *See Waggoner v. City of Garland,* 987 F.2d 1160, 1166 (5th Cir.1993) (finding that comments that a younger person could do faster work and that plaintiff was an "old fart" were "stray remarks" that were insufficient evidence to raise a genuine issue of material fact to avoid summary judgment); *Merrick v. Farmers Ins. Group,* 892 F.2d 1434, 1438 (9th Cir.1990) (finding that decision maker's comment that he chose applicant because he was "a bright, intelligent, knowledgeable young man" was insufficient to raise a triable issue of fact); *see also Joseph v. First Judicial District of PA,* No. 97–6703, 1999 WL 79056, at *5 (E.D.Pa. Feb 2, 1999) (holding that even comment could be construed to express an age animus, one such ambiguous remark is not sufficient to meet plaintiff's burden of proving pretext); *Dungee v. Northeast Foods, Inc.,* 940 F.Supp. 682, 688 (D.N.J.1996) (holding that letter explaining that a "young man" with experience had been hired was an isolated comment). Russella's comment alone is too weak to raise a reasonable inference that Momentum discriminated against older workers or that it discriminated against Lincoln because of his age. It is also clear from the record that Russella's comment was in reference to the entry-level sales representatives Momentum hired to train and not to someone that would have been at Lincoln's level professionally. Accordingly, Momentum's motion for summary judgment on plaintiff's age discrimination claims under the ADEA and the NJLAD is granted.

## V.

In count four of his complaint, plaintiff brings a state law claim alleging that Momentum breached its contract with him by refusing to pay him $10,800 from a deal that closed in March of 1998 in which Momentum's product was sold to Sun Trust Bank. Under 28 U.S.C. § 1367(c)(3), a district court "may decline to exercise supplemental jurisdiction over a claim … if the district court has dismissed all claims over which it has original jurisdiction." In addition, the Third Circuit has stated that " 'where the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide pendant state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so.' " *Hedges v. Musco,* 204 F.3d 109, 123 (3d Cir.2000) (quoting *Borough of West Mifflin v. Lancaster,* 45 F.3d 780, 788 (3d Cir.1995)). Here, plaintiff does not point to any such consideration. Therefore, plaintiff's state law contract claim is dismissed without prejudice.

## VI.

For the reasons set forth above, this Court grants Momentum's motion for summary judgment on plaintiff's ADA, ADEA and NJLAD claims. Plaintiff's state law breach of contract claim is dismissed without prejudice. This Court will enter the appropriate order.